ROBERT Y. BRENT, SURVIVING EXECUTOR OF ROBERT BRENT, USE OF THE UNITED STATES, APPELLANT V. THE PRESIDENT AND DIRECTORS OF THE BANK OF WASHINGTON.

Robert Brent was the holder of six hundred and fifty-nine shares of stock in the Bank of Washington; and was indebted to the bank as indorser on certain promissory notes, one of which became due after his death. He was also indebted to the United States, as paymaster; and he made an assignment of his property to satisfy the debt. The assignees did not accept the assignment. He died some time afterwards. The bank, under the provision of their charter, which gives a lien on the stock held by a debtor for the payment of debts due to them before the transfer of the stock held by a stockholder, insisted on the lien, against the claim of priority by the United States; and their claim was sustained by the court.

It has been the uniform construction of the fifth section of the act of 1797, 1 Story's Laws 464; and of the similar provision in the sixty-fifth section of the collection act of 1799, 1 Story's Laws 630, that whether in a case of insolvency, death or assignment, the property of the debtor passes to the assignee, executor or administrator; the priority of the United States operating, not to prevent the transmission of the property, but giving them a preference in payment out of the proceeds

This preference is in the appropriation of the *debtor's estate;* so that if, before it has attached, the debtor has conveyed or mortgaged his property, or it has been transferred in the ordinary course of business, neither are overreached by the statutes; and it has never been decided that it affects any lien, general or specific, existing when the event took place, which gave the United States a claim of priority.

Another rule is settled by these cases; that the priority does not attach to property legally transferred to a creditor on respondentia; though he may hold it subject to an account, equity or trust for the borrower. Such transfer will be protected against the United States; though not an out and out sale in the course of business, so as to divest the equitable as well as the legal interest of the party.

Every stockholder of a bank who draws or indorses a note to procure a loan from the bank, is bound to know the terms of the charter and by-laws; his signature to the note is an inchoate pledge of his stock for security, if so provided in the charter; his stock gives credit to his name, and the bank grant the loan on its faith.

APPEAL from the circuit court of the United States for the county of Washington in the District of Columbia.

Robert Brent, a paymaster of the army of the United States, having become indebted to the United States, and being in an infirm state of health; on the 17th of May 1819, executed an assignment, stating the situation of his health, and his earnest desire to satisfy and adjust the claim of the government against him as paymaster as aforesaid, and to do justice to others; and, that the better to secure these ob-

jects and purposes, the assignment proceeded in the following terms: " I have conveyed and assigned, and do by these presents convey and assign, in consideration of the premises, and for the sum of one dollar to me in hand paid, to George Graham, Joseph Pearson and Robert Y. Brent, all my real and personal estate, and property, in whatsoever consisting, and wheresoever situated, to them, the said George Graham, Joseph Pearson and Robert Y. Brent, their executors and administrators, and to the survivor of them, nevertheless, for paying and satisfying all just claim or claims of the government as aforesaid ; as well as for satisfying all just claim or claims of all others, as far forth as the said estate and property above conveyed will answer, with full power and authority to them, or the majority of them, to sell and convey, and to make good and sufficient titles to all or any part of the property referred to, in conformity with the intention and purpose of this writing : it being well understood that the said trustees, after satisfying the purposes of the said trust, shall well and fully account with the said Robert Brent, his heirs, executors or administrators, for the execution of the trust aforesaid, and fully restore to the said Robert Brent, his heirs, executors or administrators, any overplus or surplusage that may remain of the estate aforesaid ; and, it being also understood, that the said Robert Brent reserves to himself the possession and use of such part of the property aforesaid as may be for his reasonable support and maintenance; and, likewise, the privilege of disposing of any part of the trust estate, with the consent of the trustees, for the objects designated above."

It was agreed that the assignees refused to accept the assignment, or to act under it.

Robert Brent died on the 7th of September 1819, leaving real and personal estate ; and the executors qualified, and took possession of his estate in 1820. At the time of his death he held six hundred and fifty-nine shares of stock in the Bank of Washington ; and at that time he was indebted to the bank, as indorser, on two promissory notes: one for 1000 dollars, drawn by Thomas L. Washington, and indorsed by Robert Brent, due and protested on the 22d of May 1819 ; the other for 667 dollars, also drawn by Mr Washington, and indorsed by Mr Brent, due and protested on the 29th of May 1819 : he was also, at the time of his death, indorser of a promissory note drawn by John Cooke for 400 dollars, which became due and was protested on the 19th of November

1819 : making, together with the other notes, the sum of 2067 dollars ; of which 1667 dollars only were due at his decease.

Some years after the death of Robert Brent, the Bank of Washington instituted a suit against the executors on the note of 400 dollars, and on the note of 667 dollars ; and on a plea of the statute of limitations, a verdict and judgment were rendered for the defendants.

The eleventh section of the charter of the Bank of Washington provides, that " all debts actually due and payable to the bank, (days of grace for payment being passed) by a stockholder requesting a transfer, must be satisfied before such transfer shall be made, unless the president and directors shall direct to the contrary."

The same section of the charter also declares : " that the shares of capital stock at any time owned by any individual stockholder, shall be transferable only on the books of the bank, according to such rules as may, conformably to law, be established in that behalf by the president and directors."

The certificates of stock issued by the bank declare, that " the shares are to be transferred at the bank by the stockholder, or his attorney, on surrendering the certificate of the same."   There is also a provision in the section, which authorizes the directors to make regulations for the government and transactions of the bank, " conformable to law."

The executors of Robert Brent, in the year 1820, called upon the Bank of Washington, and requested to be allowed to transfer the stock held by their testator.   This was refused, without the payment of the notes, the bank claiming the same under the provision of the charter : which, it was insisted, gives the bank a right to be so paid. In 1835 the bank had retained dividends on the stock, and had sold a part of it, amounting to 289 dollars and 80 cents.

Bills were filed in the circuit court, by the surviving executor of Robert Brent, for the use of the United States, against the Bank of Washington, claiming    right to transfer the stock for the payment of the debt due to the United States ; on the allegation of the right of priority given to the United States by the acts of congress.   The Bank of Washington, at the same time, filed a bill claiming to appropriate the stock, by a sale of it, to the payment of the debt due to them ; and asserting their right to a lien  and to payment under the provisions of the charter.

The following agreement was made in the circuit court between the parties to these suits.

[Brent v. The Bank of Washington.]

"It is agreed by and between the said parties, that if the court shall be of opinion that the eleventh section of the charter of the Bank of Washington, as follows : ' all debts actually due and payable to the bank, (days of grace for payment being passed) by a stockholder requesting a transfer, must be satisfied before such transfer shall be made, unless the president and directors shall direct to the contrary,' confers upon said bank a specific lien upon the stock held by any stockholder indebted to said bank, the days of grace being passed : then the court may decree that the stock, or a sufficient amount thereof, held by complainant's testate in said bank, shall be sold at public sale, upon such terms as the court may think proper to impose, and by such trustee as they may appoint; and may further direct, that the proceeds thereof, after paying the expenses of the sale, and the costs of this suit, shall be applied to the payment of the notes hereinafter enumerated, and by this agreement admitted to be due and unpaid by the complainant's testate to the defendants ; unless the court shall further be of opinion that said lien granted by said charter is overreached, controlled and destroyed by the claims of the United States now made to a priority of payment out of said stock by virtue of the act of congress of 1799, ch. 128, sect. 65, as follows : ' in all cases of insolvency, or where any estate in the hands of executors, administrators and assigns, shall be insufficient to pay all the debts due from the deceased, the debt or debts due to the United States shall be first satisfied.' Or unless the court be further of opinion, that the claims, or debts, or said notes, due to said defendants and hereinafter particularly specified, upon two of which notes of said testate as hereinafter described, it is agreed, suits were instituted by the defendants against the complainants, on the common law side of this court, at the trial of which said suits, the complainants had solely and exclusively, upon the ground of the plea of limitations, a verdict in their favour, were thereby extinguished, and the said lien in consequence of said limitations lost and destroyed ; then the court to decree, if the claims of the United States to priority of judgment be allowed, that the proceeds of said sale be applied in payment of the debt due the United States ; or unless they shall be of opinion that the said lien is not affected by any such priority, but has been destroyed by the said verdicts in favour of complainants, then the proceeds of such sale to be applied to the payment of the note upon which no such verdict was rendered in favour of complainants."

The circuit court, on the 26th of January 1826, made the following decree in the two cases.

"These causes coming on to be heard upon the bill, answers and exhibits, and the facts stated in the agreement entered into between the complainants and defendants, it is this 22d day of January, in the year 1836, ordered and decreed by the court, that the stock of Robert Brent deceased, standing in his name, in the Bank of Washington, or so much thereof as may be necessary to satisfy the several notes in the said agreement specified, be sold at public vendue, on the credit of sixty or ninety days, the purchasers to give notes with good indorsers, as the trustee may approve ; notice being first given of the day of sale in one of the city newspapers, and that J. Hellen be, and he is hereby appointed a trustee to make said sale, and after paying the expenses of sale and costs of suit to defendants, he shall apply the proceeds of the sale to the payment of all the notes of said Brent, enumerated in the above statement as due to said defendants ; and it is further decreed, that the balance of said stock shall be transferred to the United States by said defendants, on the books of said bank."

The United States prosecuted this appeal

The case was argued by Mr Butler, attorney-general, for the United States ; and by Mr Key, for the appellants ; and by Mr Hellen, for the appellee.

For the United States it was contended, that at the time of the execution of the assignment nothing was due by Robert Brent to the Bank of Washington. His liabilities were as indorser on certain promissory notes, which, to the amount of 1667 dollars, became due after the assignment was made ; and the residue of the debt claimed by the bank, 400 dollars, became due after Mr Brent's decease.

The provision of the charter is in favour of debts actually due, and the days of grace on a note must have expired before the debt can be claimed. Thus, then, the United States, by the terms of the assignment, as well as by the operation of the statutes giving them a right of priority, became entitled to payment of the debt due to them, to the exclusion of the claims of the bank. The deed was an act of insolvency. In addition to the general principles which give the United States the prior right to the property of their insolvent

[Brent v. The Bank of Washington.]

debtor, so as to exclude all other creditors: the decree of the circuit court is erroneous, even if these principles do not apply; as the Bank of Washington is allowed to claim payment of the two notes on which suits were instituted, and judgments obtained in favour of the executors, on the plea of the statute of limitations.

The priority claimed by the United States rests in this case on the fifth section of the act of congress of 1797; 2 Laws U. S. 595; which extends the right of priority to all cases of insolvency. The United States v. Fisher, 2 Cranch 358. The act of 1799 relates to duty bonds only.

It is said that there is no proof that Robert Brent was indebted to the United States. The precise amount of the debt is not stated; but the whole proceedings in the case go upon the ground that he was so indebted. The assignment of 17th May 1819, contains an acknowledgement that he was indebted; and the agreed facts authorize the court to assume that he was a public debtor.

The next question is, whether Robert Brent became insolvent. It is objected that the assignment is not of all the property of the assignor; but an inspection of the instrument will satisfy the court that it is full and sufficient for the purpose of enabling the trustees to carry its purposes into effect, by selling the whole estate of the assignor.

If the trustees did not accept of the assignment, and no action took place under it, the objection to the claims of the United States under it may not be valid: but still the assignment is evidence of the insolvency of Mr Brent; and, the fact of his insolvency being thus established, to give, from the period of its execution, a right of the United States to be paid the debt due to them; that right could not afterwards be disturbed or affected.

The right of the United States to be paid by the executors in opposition to the claims of the bank, if not under the assignment made by their testator, exists under the provision which gives the priority in cases of the decease of persons indebted to the United States.

One of the notes was not due until after the decease of Mr Brent; and there was, therefore, at the time of his death, no more than a contingent liability for that note. He was indorser on the note of John Cook for 400 dollars; which became due and was protested on the 19th November 1819. The rights of the United States were absolute, and were fixed before the claim by the bank existed. As indorser, up to the failure of the drawer to pay, and until after demand

and protest, no debt was due by him. The drawer of a note is said to be a debtor from the date of the note : his debt is debitum in presenti, solvendum in futuro ; but not so an indorser.

The bank has no claim on the notes sued for, and in which suit a judgment, on the statute of limitations, was rendered against the bank. The obligation to pay the debt was at an end, when the judgment was given. Thus, if the bank had a lien on the stock, as they elected to sue out the notes, the lien was abandoned. While in England it may be different; in the United States, after the statute of limitations has attached, the debt is gone, and a new promise is absolutely necessary to re-create the debt.

It is not admitted that a construction can be given to the charter of the bank which will interfere with the priority of the government. Whatever effect the provisions of the charter, giving the bank a lien on the stock of their debtors, may have in the case of individuals; no such effect can exist as will interfere with the right of the United States to their priority. The object of the charter was not to repeal laws already established and in full force; and least of all, laws which are deemed essential to the fiscal operations of the government, such as those which give the government priority of claim in cases of the insolvency or decease of their debtors. The whole of the eleventh section of the charter must be taken into consideration. It empowers the directors to make regulations *conformable to law.* From these words it may be inferred, that congress did not intend by the charter to alter any existing laws. They recognised in this provision the laws as established and in force; and the rules and regulations of the bank were to be in harmony with them.

Mr Hellen, for the appellees, observed, that before he proceeded to discuss the several propositions arising in the cause, it would be necessary to state, that the record provided the proof of every fact that could, on the part of the bank, be required, to charge the stock of the deceased, by virtue of the eleventh clause of the act of congress, entitled an act to incorporate the Bank of Washington, passed the 15th February 1811.

It is admitted by the appellants, that their testator died indebted to the bank, on the respective notes described in the statement of facts agreed upon by all the parties to both the suits set for hearing in the court below. It is admitted, that at the time of his death, Robert Brent held six hundred and fifty-nine shares of stock in the

[Brent v. The Bank of Washington.]

bank. That the notes were severally protested, and that due notice of their non payment was regularly given to him in his lifetime, or to his executors since his decease. That the notes were yet due and unpaid.

The record thus substantiating the debts due to the bank, he should respectfully submit to the consideration of the court, in support of the decree rendered in favour of the bank by the circuit court, the following propositions: 1st. That the eleventh clause of the charter of the bank, which required "that all debts actually due and payable to the bank, (days of grace for payment being passed) by a stockholder requesting a transfer, must be satisfied before such transfer shall be made, unless the president and directors shall direct to the contrary;" gives the bank a lien on the stock held by Robert Brent at the time of his death.

2. That the act of 1799, which directs "that in all cases of insolvency, or where *an estate in the hands of* executors, administrators, or assignees, shall be insufficient to pay all the debts due from the deceased, the debt or debts due to the United States shall be first satisfied;" gives to the United States a simple priority of payment, and no lien ; and that it cannot divest the bank's lien.

3. That even if the United States have a priority of payment, by the act of 1799, the charter of the bank affects it ; there being in the charter no exception in favour of the United States.

4. That this stock never has been an estate in the hands of the executors, but as incumbered with the lien.

5. That the deed of Robert Brent, in favour of the assignees, never was accepted by them; and it is therefore void.

6. That the stock can only be transferred as the charter directs.

7. That the statute of limitations cannot discharge the lien.

Mr Hellen remarked, that the first proposition was so obvious, that he would even pass it by without comment, were it not necessary to fix a precise idea of the extent of the rights of the bank, as provided by the clause of the charter.

The clause is itself imperative. The words "all debts actually due and payable to the bank, must be satisfied, before such transfer shall be made, (days of grace being passed)" are "*absolute, explicit, and peremptory ;*" and show that no discretion is given : and when that is the case, even affirmative words make a statute imperative.

The fundamental rule for expounding statutes is, "that if it can be prevented, no clause, sentence or word should be deemed su-

perfluous, void, or insignificant.". To say, then, that the stock can be transferred, before the debts of the stockholder are satisfied, is to render every word inoperative, insignificant and entirely nugatory. The right of the bank to be first paid, before the stock can be transferred, must be wholly annihilated, before the United States can, by the legal fiction, have it vested in the executors at the death of their testator, so as to make it an estate in their hands, to authorize a priority of payment to the government. This makes it a conflict between a right secured by the charter and a *legal fiction*. The doctrine of relation cannot, however, divest any right legally vested in another ; as where rent was due to landlord who died, and execution was levied on the tenant's goods before letters granted, on a notice by administrator to the sheriff, to pay him a year's rent, agreeably to the statute of 8 Anne, ch. 17; the court held that relations, which are but legal fictions of law, should never divest any right legally vested in another. 1 Williams on Executors 398. He should show hereafter, when he undertook to discuss the fourth proposition, that the Maryland statute placed an executor on the same footing as an administrator by the common law ; and at this time, merely asked the court to apply this doctrine of relation to the note of 400 dollars, which fell due after the death of Robert Brent. That note fell due on the 19th of November 1819; Robert Brent died on the 7th September 1819, and letters testamentary were not granted until 1820. So that the note having fallen due before the executors had a right to demand of the bank a transfer of the stock, which right only accrued to them by virtue of the letters testamentary, this legal fiction cannot divest the right of the bank (which was perfected when the note fell due) to be satisfied, before they could enforce a transfer of the stock. He also stated, that all the shares were bound for the payment of the note due on the 22d May 1819 ; and that alone operated to destroy the common law right, by which an estate vests in the executor at the death of the testator. Suppose, instead of stock, it was a movable chattel of the testator's in the bank, which the charter provided should not be assigned, or delivered up, before the notes were "satisfied." How could an executor, by virtue of this constructive right to the property, proceed to enforce that right? Thus test the extent of his powers. He could not maintain an action of trover, because there would be no illegal conversion. Replevin would not lie, because there would be no tortious taking of the property. Detinue

would not aid him, because he has no right to the immediate possession; for, in the language of the charter, the debt must be satisfied before a transfer shall be made. It cannot be contended, that the death of a stockholder changes the rights of his representatives. Executors stand in the place of their deceased, and are bound by his covenants, although not named in the deed. His act has the same effect. They take subject to the rights of the bank, as secured by the charter. In Wilkinson v. Leland and others, 2 Peters 658, it is expressly ruled, "that where an heir takes real estate, his title is incumbered with all the liens, created by the party or the law, at his decease." This court, in the case of the Union Bank of Georgetown v. Laird, 2 Wheaton 390, decided that the charter of the bank conferred a lien on the stock.

Having thus by authorities of the most commanding character, clearly established the lien; he should proceed, with a full conviction of the magnitude of the subject, to invite the attention of the court to the important principle involved in the examination of his second proposition. Can the priority of the United States, by the act of 1799, divest a lien? In stating the question in this form, he suggested that it permitted the United States, very improperly, to advance a move in the game. The true question is not whether the acts of congress can divest a lien, by virtue of the priority; as whether a debtor on whose property a lien has attached, can by his *conveyance*, assignment, or death, divest that lien?

By the acts of congress, an estate is to be "in the hands of executors or assignees," before the priority of the government accrues. This arises in the one case by the act of God, which, when it happens, never defeats vested rights. The other depends on the act and deed of the debtor. He must convey, and the priority of the United States is dependent on that conveyance. If a debtor can by his own deed or grant to assignees, defeat a prior lien, this he can effect by any bona fide alienation. A marriage settlement or contract will accomplish it. If it can be done by an insolvent debtor, the solvent debtor, by a conveyance, can also discharge pre-existing liens.

If a debtor by his conveyance can discharge a lien, he can discharge any and every lien, such as the parties create by contract; such as arise by operation of law; such as are created by statutes. Suppose then, that these statutes gave to the United States, not a simple privilege, but a lien on the property of their debtors. Could

it be contended, that the conveyance of the debtor in the one case, would defeat the lien, or that his death in the other, where there were judgment creditors, would entitle them to a preference in payment out of the very property which was incumbered with the lien? If this be the law, it demonstrates that what you call a lien "is an unreal mockery," a non-descript, unsubstantial, and over which the creditor has no controlling interest. This, however, is not so. Such a position is exploded by the argumentum ad absurdum. If it could be sustained, it would expose all legislative or statutory liens to the charge of the most inefficient and fatuitous folly.

But suppose a contract provides in its very terms, that the creditor shall have a lien on a chattel, and congress should pass an act displacing the lien of the creditor. This would be a law impairing the obligation of a contract, and consequently void. Now, if it cannot be impaired by direct legislation, it cannot be done indirectly. The tenth section of the first article of the constitution of the United States, prevents the states from passing a law impairing the obligation of a contract. Congress has no power to pass such a law. No such power is delegated to congress; and the tenth amendment to the constitution, reserves to the people the powers not delegated to congress.

He should now refer to adjudicated principles; and inasmuch as he should refer to English cases, he would first advert to the laws of the crown, as this regarded the debts of the subject. In Ram on Assets 19, we find, that by the statutes of 33 Hen. 8, ch. 39, and 13 Eliz. ch. 4, the crown has a lien on personal property, from the date of the writ or bond; on real estate, the moment the subject takes office. The laws of this country are different; but the fallacy of the notion that a priority of payment, which is not a lien, can divest a lien, flows immediately by taking the converse principle. In Fisher v. Blight, 2 Cranch 358, this court decided that these laws did not confer a lien on the debtor's goods; and the reason apparently assigned for it is, "that no transfer of property in the ordinary course of business was overreached." Suppose then that these laws of congress, as the English statutes do, declared it to be a lien; would it not "overreach a bona fide transfer of property, in the ordinary way of business." If it could not, the consequence is that it confers no security at all, if the goods be not thereby bound. The same reasoning will apply to the case of the United States v. Hoe, 3 Cranch 73. The next case to which he would invoke the consideration of the court, was that of Conard v. The Atlantic

Insurance Company, 1 Peters 441, 444. What is there asserted as to this priority of the United States? "Why that it is obvious, that the priority of the United States cannot divest a lien, because it is not equivalent to a lien." In that case, it is also remarked, that the authority of Nathan v. Giles, 5 Taunton 578, would require very grave consideration, before any such principle should be sanctioned, as that this priority of the United States can divest a lien. This is it. "When a factor had a lien on a cargo, which was attached by a creditor, the court directed the proceeds of sale to be paid to the factor."

But in England the king's prerogative has never been sufficiently strong to divest a lien, greatly as it exceeds this comparatively feeble power of priority, given by these acts to the United States. In Rex v. Lee and others, 6 Price 369, where a factor had a lien on goods, and they were seized by an extent, in favour of the crown, against the principal, the court ordered the proceeds of the sale to be applied in discharge of the lien. Suppose that the principal had died, could it be pretended, that this thereby defeated the lien, so as to give the crown a right to the proceeds, when the lien or right to it still existed? Rorke v. Dayrell, 4 Term Reports 402, also decides "that where goods are seized on a fieri facias, as the king's debtor's, and before they are sold, an extent comes, at the king's suit, grounded on a bond debt, tested after delivery of the fieri facias; the extent cannot affect those goods." The case of Thelluson v. Smith presents a very simple question. A junior judgment creditor seizes land which was bound by a prior judgment; and the senior creditor, instead of enforcing payment, by levying on the land in the possession of the purchaser, trys to have the proceeds of the sale applied to the payment of his senior judgment. This he had no right to do, but instead of the sale of the land divesting his lien, it was still liable; and by issuing a scire facias, against the purchaser, so as to put his judgment in a condition for execution, that lien could be enforced.

In order to show that the death of the party could not defeat the lien creditor's rights, so as to vest the estate in the hands of executors discharged of the lien; he cited, Bolton v. Tate, 1 Swanston 84: also, Montague on Lien 61; who states, "that solicitor of plaintiff, who dies, has a lien upon the sum decreed in preference to bond creditors." In Hammond v. Barclay, 2 East 227, it was argued, that the death of a debtor annulled the lien by revoking the authority. The court said, "such a position was inconsistent with the justice of the case."

If this argument should be sanctioned as the law of the land, he beseeched the court to consider the dreadful consequences which would ensue from such a principle. A ship owner has a lien on the cargo for freight. He makes his voyage, that is to say, he is in sight of land; and before his arrival in port, the owner of the cargo dies. His estate is insolvent, and the consequence is, that his lien is utterly defeated. So also, the hardy tar, who perils the danger of the sea, is to go unpaid, after making, probably, a voyage to the distant Indies. But specification is useless. This deleterious and shameful perversion of justice can be confined to no order. It will inflict ruin upon the adventurous mariner, the enterprising merchant, the careful and industrious mechanic; and before the jurisprudence of the country should be stained with so odious a principle, it was right that it should receive the grave consideration of this court.

Should the court be even disposed to sanction the principles contended for by the appellant; yet the record in this case furnished no evidence of any one fact which could sustain the claim of the government.

It has been already settled by this court, that "on an appeal, the court can only take notice of matters of fact appearing upon the record." Governor of Georgia v. Madrazo, 9 Peters 110; 5 Peters 248. There is no proof on the record that Robert Brent died indebted to the United States. No bond or transcript of his account is certified in due form by the proper officers of the government. There is no proof of his having committed a legal insolvency. There is no proof on the record, that his estate in the hands of his executors is insufficient to pay his debts. The answer does not admit it. No account of assets; no schedule of his debts establishes the fact. There is no proof that he held the stock when he made the deed. The appellants admit that the trustees did not accept the deed; and that at the time of its execution Robert Brent owned a large estate in fee simple. This admits the deed to be void; and if it were not, by the decision in United States v. Hoe, p. 73, it must convey all his property to give a priority. In this deed there are no words of inheritance; and, of course, it cannot vest an estate in fee simple. Robert Brent made a will; and that is sufficient to show that the deed did not include all his estate: so that the appellant has no proof to authorize a reversal of the decree. The priority cannot affect the lien of the appellees; because the charter contains no exception in favour of the United States. It is also matter of subsequent creation to the act of 1799.

[Brent v. The Bank of Washington.]

It is admitted, that the king of Great Britain, by virtue of his prerogative, is not affected by either of these objections. He is not bound by any act unless named. He should, however, insist, that before the United States can claim the benefit of this prerogative, they must introduce it into the system of the body politic by a legislative act. Until the legislative power of the government, in a lawful way, by a positive statute, asserts a claim to this prerogative, it continued a dormant, inoperative and powerless right, inherent in the constitution, but to be born of congress before it can be nursed by the judiciary, or even be considered as a vigorous, practical and active principle. The judiciary is constituted for the express object of expounding the laws of the country. A law there must be emanating with the legislature, before the functions of the judiciary can commence.

Should this distinction be not carefully observed by each co-ordinate branch of the government; which it was the great object of the framers of the constitution to provide, in separating their powers, and allotting to each its distinct duties: then the rights of the legislative department are disregarded. Blackstone on the King's Prerogative, vol. 1, p. 240, observes, that "it was customary, in the early history of England, for the king to sit as a judge to expound the laws in his own courts." This alone accounts for the manner in which the prerogative of the king has been cherished by judicial authority. To illustrate, however, the precise import of this principle, he would take the prerogative, which gave priority in payment to the king. Suppose that congress had never legislated on this subject. It is admitted that the power to make the law exists in congress. Without a law, could the attorney-general, on the death of a citizen indebted to the United States, by virtue of this prerogative, compel an executor to prefer the debt of the government? Suppose he should sue him, and allege a devastavit, because he paid judgment creditors in preference to the debts due to the United States: would the court allow this prerogative to operate against the executor? The king has also the right to erect beacons, light-houses, &c. He can take the money from the public treasury to make the erection. In this country congress possesses such power. They can, by statutory enactments, authorize their erection. But neither the executive nor the judiciary can claim the prerogative. If this be not so, then the social fabric, the constitution of the country, is placed upon no solid basis of delegated powers. He admitted

that the common law had been received in civil cases as a part of the jurisprudence of the United States; where it did not conflict with the fundamental principles of its republican form of government. This prerogative of the king is an exception to the general principle of the common law. "By the word prerogative, we usually understand, that special pre-eminence which the king hath over and above all other persons, out of the ordinary course of the common law, in right of his regal dignity." 1 Black. 240.

But this charter is a contract, a grant, a franchise. All its rights are beyond the reach of the government. He would not stop to apply this principle; but would refer to the case of the Dartmouth College, 4 Wheat. 518. He would say, however, that congress gave the bank a right to hold the stock until the debt was paid; and this right was valuable to the institution. This stock is not assets in the hands of executors: "where a testator pledges goods, they are not assets until redeemed." 2 Williams on Executors 1015. By the act of Maryland of 1798, c. 101, sub. c. 3, "an executor or executrix named in a will cannot dispose of the chattels or interfere therewith until letters issue: he must give bond within twenty days. The court must direct a sale. By this modification he stands as an administrator at common law, and had no right to ask a transfer before letters issued.

As to the fifth and sixth points, the attorney-general admitted the deed to be inoperative, the trustees not having accepted it. As to limitations, it goes to the remedy, and does not affect the debt. He cited Montague on Lien, app. 38, to show that the lien was not discharged by the statute. Indeed, the very essence of a lien was a right to retain the chattel until the debt was satisfied.

Mr Justice BALDWIN delivered the opinion of the Court.

Robert Brent, the testator, owned six hundred and fifty-nine shares of the capital stock of the Bank of Washington in this District, which stood in his name on their books at the time of his death in September 1819: when he was indebted to the bank 1667 dollars as indorser of two notes drawn by J. L. Washington; one of which was protested on the 19th, the other on the 22d of May preceding, and due notice thereof given. He was also indorser of a note of John Cooke due said bank, payable on the 19th of November 1819, which was also duly protested, and notice thereof given. On the 17th of May 1819, he made an assignment of all his estate, real and personal, to

secure the United States, to whom he was indebted, and all other creditors; which was recorded the same day, but never was accepted by the trustees, and became inoperative.

In 1820 the complainants, as executors, administered on the estate, when they called on the bank to allow them to transfer the stock belonging to the estate; which was refused by the bank on the claim of a lien for the amount of the above notes, of which they demanded payment before they would permit a transfer thereof on their books. Suits were afterwards brought by the bank against the executors, to recover the amount of the three notes; in one of which they obtained a verdict: on the two others, verdicts were obtained in favour of the executors, on the plea of the act of limitations.

In 1827 the executors filed their bill on the equity side of the circuit court, praying for a decree to transfer the stock discharged from any alleged lien of the bank for the debt due by the testator; on the ground, that being a debtor to the United States to a large amount, and his estate insufficient to pay his debts, the debt due to them ought to be first paid, pursuant to the provisions of the fifth section of the act of 1797, 1 Story 464, 465; and that the debts claimed by the bank were barred by the act of limitations, and the verdict rendered for the defendants. These are the only questions in the case.

The act of congress referred to is in these words: "that where any revenue officer or other person hereafter becoming indebted to the United States by bond or otherwise, shall become insolvent; or where the estate of any deceased debtor, in the hands of executors or administrators, shall be insufficient to pay all debts due from the deceased, the debt due to the United States shall be first satisfied."

It has been the uniform construction of this act, and the similar provision in the sixty-fifth section of the collection act of 1799, 1 Story 630, that whether in a case of insolvency, death or assignment, the property of the debtor passes to the assignee, executor or administrator; the priority of the United States operating, not to prevent the transmission of the property, but giving them a preference in payment out of the proceeds. Conard v. Atlantic Insurance Company, 1 Peters 439.

This preference is in the appropriation of the *debtor's estate;* so that if, before it has attached, the debtor has conveyed or mortgaged his property, or it has been transferred in the ordinary course of business, neither are overreached by the statutes; 1 Peters 440: and it has never been decided that it affects any lien, general or specific,

existing when the event took place which gave. the United States a
claim of priority.    In the case of Conard v. The Atlantic Insurance
Company, above quoted, in Conard v. Nicholl, 4 Peters 291, and
Conard v. The Pacific Insurance Company, 6 Peters 262, 279, this
court considered the effect of the priority of the United States, in
cases where their debtor had taken up money on respondentia bonds,
on an agreement that the bill of lading of the goods therein men-
tioned, should be indorsed to the lenders as a collateral security for
the loan; that the return cargo should be consigned to them on their
account and risk, the bills of lading to be so expressed, indorsed in
blank and delivered to them, and the property be, delivered to the
order of the shippers, as a continuation of the collateral security.
This was held, in all these cases, to amount to a transfer of the abso-
lute legal right to the property composing the return cargo, to the
holders of the bonds; so as to enable them to recover their value from
the marshal, who had levied on them by virtue of an execution at
the suit of the United States, and detained them after a demand of
delivery.    They recovered damages commensurate with their legal
right of property; and the court would not inquire whether, in any
event, the lenders on respondentia could be considered as trustees for
the borrower, his creditors or assigns; deeming it immaterial.  6 Pe-
ters 272.

. .  Another rule is settled by these cases: that the priority does not
attach to property legally transferred to a creditor on respondentia,
though he may hold it subject to an account, equity or trust for the
borrower.  Such transfer will be protected against the United States;
though not an out and out sale in the course of business, so as to
divest the equitable as well as the legal interest of the party.  Such
a transaction approximates to one which merely gives a lien; its
object is security, not a sale : it is in law a sale by the shape of the
contract and securities, but if the goods were of greater value than
the debt due, equity would compel an account for the surplus, con-
sidering the whole transaction to have been one of loan and priority
merely.    On the other hand, if the borrower, his creditor or assignee
should come into equity to ask such account, it would be decreed to
him only after the payment of the debt due ; the holder of the se-
curity would be allowed to retain it for such purpose, however defect-
ive it might be at law.    Nor would a court of equity take from the
lender any legal right, which he might have to the possession of the

[Brent v. The Bank of Washington.]

property, or to prevent its transfer to another, whereby such right would be impaired; if his conduct had been bona fide.

. Whatever may be the defects in the rights of a bona fide creditor at law, equity will protect him in their enjoyment, till they are lost at law; if his conscience is not so affected as to bring him within the jurisdiction of a court of conscience, which does not administer legal remedies for legal rights. Its action is on equitable rights, by equitable remedies; or legal rights for which the law provides no remedy, (3 Peters 447) or none so adequate as equity, so beneficial or complete. 9 Wheat. 845. This is a case of that description, or the plaintiffs have no standing in equity; for if they have a complete legal right to priority of payment out of the stock of Mr Brent, and a remedy to enforce it, plain, adequate and complete at law; the sixteenth section of the judiciary act, 1 Story 59, is a proviso on the jurisdiction of a court of equity; and it is not a case in equity, under the third article of the constitution.

In the bill of the complainants, they do not contest the lien of the bank by any paramount right in themselves as executors; they are the mere conduits through whom the United States claim the benefit of the legal priority given them by law; which the executors are compelled to assert, in order to save themselves from the consequences of their paying any other debt than that due to the United States before it is satisfied, as prescribed by the sixty-fifth section of the collection act.

If Mr Brent was such a debtor as is contemplated by the law, and died without property sufficient to pay his debts; the right to satisfaction out of his estate, in preference to any other creditors, is undoubtedly in the United States. The record does not contain any evidence of insolvency: but as the case has been argued on the assumption that it existed, and that Mr Brent was a debtor within the purview of the law; the court will so consider him and his estate. Assuming then the right of the United States as respects the executors, and all his creditors, except the bank, to priority of payment, to be complete; we find them, through the executors, plaintiffs in equity, claiming a decree for the transfer of the stock of the testator standing on the books of the bank, in order to have it sold for the exclusive payment of their debt. A court of law cannot do this; for by the eleventh section of the bank charter, the stock is transferable only on the books of the bank, according to such rules as may, conformably to law, be established in that behalf by the president and

directors. Davis's Laws Dist. of Col. 224. On a similar provision in the charter of the Union Bank of Georgetown, this court, in the Union Bank v. Laird, declared, that "no person could acquire a legal title to any shares, except under a regular transfer, according to the rules of the bank." 2 Peters 393. The executors cannot sustain a suit at law in their own right, for refusing to permit such transfer; inasmuch as, by another clause of the same article in the charter, it is provided : "but all debts actually due and payable to the bank, (days of grace for payment being past) by a stockholder requesting a transfer, must be satisfied, before such transfer shall be made, unless the president and directors shall direct to the contrary."

As Mr Brent owed the debts now claimed by the bank, on the notes due and protested before his death, this would be a complete answer to a suit at law by his executors, for not permitting a transfer; and the same objection would be fatal to a suit in their name for the use of the United States. The defence is a legal one : the case provided for by the charter and by law had happened; the bank had a perfect right to hold on to the stock; and this court has decided in the case of Laird, that a rule of the bank imposing such a restriction on the transfer of stock, is conformable to law. 2 Wheat. 392, 393.

The United States have no pretence of a legal right to a transfer of the stock to themselves, or to recover damages for refusing it: the right to hold the stock devolves on the executors, to whose hands it must come for sale and distribution : the proceeds, not the stock, go to the United States in virtue of their priority : such are the words of the law—" the estate of any deceased debtor in the hands of executors or administrators." Thus compelled to come into equity for a remedy to enforce a legal right, the United States must come as other suitors, seeking in the administration of the law of equity, relief; to give which, courts of law are wholly incompetent, on account of the legal bar interposed by the bank. This court, in the United States v. Mitchell, 9 Peters 743, have recognized the principle in the common law, that though the law gives the king a better or more convenient remedy, he has no better right in court, than the subject through whom the property claimed comes to his hands. 2 Co. Inst. 573; 2 Ves. Sen. 296, 297; Hard. 60, 460. This principle is also carried into all the statutes, by which the appropriate courts are authorized to decide, and under which they do decide on the rights of a subject in a controversy with the king, according to equity and good conscience between subject and subject. 7 Co. 19; 6 Hard. 27, 170, 230, 502; 4 Co. Inst. 190.

It is not difficult, in this case, to decide what the rules of equity and good conscience require. The bank have lent their money on the name, credit and stock of Mr Brent, before the United States could have any claim of preference. Two notes were due, protested, and the legal lien of the bank for their payment complete : as to the third, the time for repayment had not arrived before such right attached on the property of Mr Brent in the hands of his executors ; but it was confined to what belonged to, and was part of the assets of the estate. The right was a legal one ; the claim of the United States was a statutory one ; but its existence was not founded on any bad faith of the bank, its conscience was unaffected, and by law they held the legal control of the transfer of their stock : their consent was necessary to the transmission of the legal title to the executors ; and the only ground on which the aid of a court of equity is asked to compel them to give their consent, is a legal claim to the proceeds, by a right which will deprive the bank of all security for their debt. In good conscience there can be no claim more equitable than that of the bank for money lent ; and if the law has placed them on the *tabula in naufragio*, it little comports with the principles of equity to take it from them, merely because, by the death of Mr Brent before the protest of the third note, the legal lien, secured by their charter, had not become consummated, before the legal right of the United States had attached to priority of payment out of his estate. An individual asserting such a claim in equity against the bank, in virtue of an act of bankruptcy, an execution or assignment, between the date and the protest of the note, would be compelled to do equity before he could enforce his legal right : and we can perceive no reason why the United States should be exempted from this fundamental rule of equity, subject to which, its courts administer their remedy.

Every stockholder who draws or indorses a note to procure a loan from the bank, is bound to know the terms of the charter and by-laws ; his signature to the note is an inchoate pledge of his stock for security ; his stock gives credit to his name, and the bank grants the loan on its faith.

Though the charter has not made the note a lien on the stock till the note is protested; so as to give the bank both a legal and equitable right to refuse the transfer till it is paid; yet it has given them the power to prevent a transfer unless on their books, by such rules as they may prescribe ; which gives them power to prevent the legal

title from passing to a purchaser. Connecting this with the power to make by-laws for the government of the bank and the management of their concerns, the bank would have a strong case in equity, had the latter clause in the eleventh section of their charter been omitted.

Under the usual clause in the charter to the Hudson Bay Company to make by-laws, &c., they had made one respecting the trans fer of their stock, so that it should be first liable for debts due to the company by their own members, or to answer the calls of the company on their stock. One of the stockholders, indebted to the company for money received for their use, became bankrupt; his assignees brought a bill to compel a transfer of his stock, which was opposed by the company in virtue of their by-laws. The chancellor declared "the by-law a good one; for the legal interest of all the stock is in the company, who are trustees for the several members, and may order that the dividends to be made, shall be under particular restrictions or terms ; and by the same reason that this by-law is objected to, the common by-laws of companies, to deduct the calls out of the stocks of the members refusing to pay their calls, may be said to be void." Child v. Hudson Bay Co., 2 P. W. 207, 209 ; S. P. 1 Str. 645 ; 1 Eq. Cas. Ab. 9, pl. 8; 13 Ves. 428, 429.

In Waln's Assignees v. The Bank of North America, it was held by the supreme court of Pennsylvania, that when, by the known usage of a bank, the stock of a debtor was not transferable till the debt was paid, such usage was binding on his assignees ; the bank having, by their charter, power to make by-laws, and having made one requiring all transfers to be made on their books, in the presence of its officers. 8 S. & R. 73, 86. In giving such power by charter, and executing it by such a by-law, the intention of the law of incorporation is, most evidently, to give a security to the bank : by permitting a transfer and giving a certificate to the holder, the bank give up all claims on the stock; the legal right to supervise the transfer was intended for their benefit. On this principle, this court say, " no person, therefore, can acquire a legal title to any shares, except under a regular transfer, according to the rules of the bank; and if any person takes an equitable assignment, it must be subject to the rights of the bank under the act of incorporation, of which he is bound to take notice." 2 Wheat. 393.

The principle of these cases covers the present in all its bearings. It is admitted that the bank have a legal right to withhold the

transfer till payment of the notes protested in the lifetime of Mr Brent; the case is equally clear in equity as to the note indorsed by him and discounted by the bank, though not protested till after his death.

A commission of bankruptcy relates to the act of bankruptcy, having the effect of an execution; it prevents the transmission of the bankrupt's property from that time to any but his assignees; the same effect follows a voluntary assignment: both operate to transfer the property itself; whereas the priority of the United States attaches only after the transfer is made by the party, or by operation of law at his death. If then the lien of a corporation attaches to an actual transfer of the stock, so as to make it subject to all their equitable demands upon it; a fortiori, it must remain on it when a preferred creditor can claim payment only out of the proceeds in the hands of the assignees, or personal representatives of the debtor.

So long, then, as this note remains due and unpaid, the complainants are not entitled to a transfer of the stock owned by their testator,

But they allege that the debt is extinguished by the verdict in their favour, rendered on a plea of the statute of limitations.

In the Bank of the United States v. Donnelly, 8 Peters 361, this court laid it down as an established principle, that the act of limitations operated only to bar the remedy, not to extinguish the right or cause of action; and that a judgment on a plea of the statute was only to bar the remedy on a contract, when sued for in Virginia, as the limitation act of that state embraced the one declared on; but did not operate to extinguish the contract when sued for elsewhere, or in Kentucky, where by the *lex loci* it was not affected by any limitation. Ib. 370.

We cannot take this case out of this established rule: the legal remedy is barred, but the debt remains as an unextinguished right; and the bank, when called into a court of equity, may hold to any equitable lien, or other means in their hands, till it is discharged.

The decree of the circuit court is affirmed.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the District of Columbia, holden in and for the county of Washington, and was argued by counsel; on consideration whereof, it is decreed and ordered by this court, that the decree of the said circuit court in this cause be and the same is hereby affirmed with costs.