# UNITED STATES v. SHELBY IRON CO.

(Circuit Court of Appeals, Fifth Circuit. March 10, 1925.)

No. 4284.

**1. United States ⟨⟩141—Facts held to prove government's knowledge of contract of its grantor to reconvey to predecessor.**

In suit by the United States government to quiet title to land conveyed to the government by defendant's grantee, facts *held* to show actual knowledge on part of government's officer at time of execution of contract with grantee, of grantee's contract to reconvey land to defendant.

**2. United States ⟨⟩75—Notice of contractor's contract to reconvey land conveyed by contractor to government imputed to government.**

Where contract for purchase by United States government of acetate of lime and methyl alcohol, and for construction by government of plant on land to be conveyed to government by seller, and for reconveyance of land on termination of war, referred to seller's contract with its grantor of land, notice of provision of such contract with grantor, providing for reconveyance by seller of land to grantor, will be imputed to government.

**3. United States ⟨⟩40—Government bound by notice to agent.**

The United States government is as much bound by notice to one of its agents as is an individual or private concern.

**4. United States ⟨⟩124—Government comes into equity in same manner as other suitor in assertion of property rights.**

The United States government, when it seeks to assert rights to property, comes into equity in same manner as other suitor.

**5. United States ⟨⟩75—Government held precluded from acquiring title from contractor by provisions of contract providing for reconveyance by contractor to third party.**

Where contract for purchase by the United States of war materials provided for construction of plant by government on land to be conveyed by contractor to government, and for removal of buildings and equipment within six months after termination of war, and reconveyance of land to contractor, and where contractor referred to contractor's contract with third party providing for reconveyance by contractor of land to such third party, government could not acquire title free from rights of such third party to reconveyance by taking deed from contractor.

**6. United States ☞75—Government held entitled to dismantle and remove part of plant constructed by it, and was not required to accept reasonable value thereof.**

Where contract for purchase by the United States of war materials provided for construction of plant by government on land to be conveyed to government by contractor, and for dismantling and removal of buildings and equipment on termination of war, and reconveyance of land to contractor, the government cannot be required to accept the fair and reasonable value of the buildings and equipment following termination of war, but may dismantle and remove that part of plant constructed by it.

Appeal from the District Court of the United States for the Northern District of Alabama; William I. Grubb, Judge.

Bill by the United States against the Shelby Iron Company. Judgment for defendant, and complainant appeals. Affirmed.

John B. Keeble, Sp. Asst. Atty. Gen., and C. B. Kennamer, U. S. Atty., of Guntersville, Ala.

E. H. Cabaniss, of Birmingham, Ala. (Cabaniss, Johnston, Cocke & Cabaniss, of Birmingham, Ala., on the brief), for appellee.

Before WALKER and BRYAN, Circuit Judges, and CLAYTON, District Judge.

BRYAN, Circuit Judge. The United States filed a bill in equity against the Shelby Iron Company to quiet the title to a tract of about 15 acres of land. The bill traces title from the Iron Company to the Shelby Chemical Company by a deed which misdescribes the grantor, and from the Chemical Company to the United States. The defense of the Iron Company is that it was entitled to a reconveyance of the land from the Chemical Company by virtue of a contract between them, upon the faith of which the Iron Company made its deed, and that the United States acted throughout with notice of the contract and of the provision for reconveyance. The answer offers to do equity, by purchasing the improvements and buildings which the United States put upon the land, and by paying the fair and reasonable value thereof, or by allowing their removal within a reasonable time.

The Shelby Iron Company is a manufacturer of charcoal iron. In April, 1918, it was also manufacturing its own charcoal by the use of kilns, and supplying itself with wood, out of which it made charcoal, from a large tract of hardwood timber which it owned. About that time the Shelby Chemical Company, an entirely separate and distinct corporation, notwithstanding the similarity of names, represented to the Iron Company that it had been organized for the purpose of manufacturing charcoal and other by-products, including acetate of lime and methyl alcohol, by a modern and improved process of retort distillation, which would produce from the same quantity of wood practically one-third more charcoal, of a better quality then could be produced by the kiln method. The Chemical Company further represented to the Iron Company that it was then negotiating for a contract to manufacture and sell to the United States large quantities of acetate of lime and methyl alcohol, which were required for war purposes, but that it could not secure such contract from the government unless and until it had first made satisfactory arrangements for the supply of a sufficient quantity of wood and the furnishing of adequate plant facilities, including water, steam, power, and houses for its workmen.

Thereupon the two companies entered into a contract, dated April 8, 1918, by the terms of which the Iron Company agreed to supply to the Chemical Company a site and enough cordwood to operate the chemical distillation plant to its maximum capacity of 100 cords per day, to erect 36 workmen's houses at an average cost of $1,000 each, and to furnish the necessary water, steam, and power. The Chemical Company on its part agreed to convert the cordwood into charcoal and to supply the Iron Company with charcoal at a stated price per cord. The contract was to remain in effect until 1933, with the option to the Chemical Company to extend it for a further period of five years. It also contains the following provisions:

"The Iron Company further agrees to deed by good and sufficient deed of general warranty, free from all liens and incumbrances, for the consideration of one dollar ($1), sufficient ground on which to erect and construct the plant and buildings of the Chemical Company, together with the tracks of the Chemical Company. Inasmuch as the United States government will be financially interested in the construction of the Chemical Company's plant, it is expressly agreed that said real estate may be deeded to and vested in the United States government during the period of a contract made between the Chemical Company and the United States government, said contract to extend for the duration of the war." And "it is understood that the Chemical Company is about to construct its plant under a contract with the United States government, by the terms of which the Chemical Compa-

ny is to become the owner of the land, buildings, equipment, and improvements, if an enabling statute to that effect shall be passed by the Congress of the United States. Therefore it is distinctly agreed that the foregoing provision as to reconveyance of the lands is subject to the obtaining of the title to said lands by the Chemical Company from the United States government."

It is further provided that, upon the termination of the contract, the Chemical Company should reconvey without cost the land in controversy, free from lien, or incumbrance, to the Iron Company, and that the latter should have the right at its option to purchase all improvements and equipment placed thereon at a price to be fixed by arbitration. There was no other consideration for the contract than the mutual covenants of the contracting parties.

On April 23, 1918, the Chemical Company entered into a contract with the United States for the construction of a plant for the manufacture of acetate of lime and methyl alcohol. It was estimated that the plant would cost $400,000, which the United States agreed to advance, and reimburse itself by deductions from payments to be made for the acetate of lime and methyl alcohol. That contract recites: "Whereas, the contractor has a contract with the Shelby Iron Company, of Shelby county, Alabama, according to the terms of which the Shelby Chemical Company shall receive all the lumber it may require from timber lands owned and leased by the Shelby Iron Company in return for all charcoal derived therefrom." And it contains the following: "The contractor will grant and convey, or, at the option of the Chief Signal Officer of the Army, will lease to the United States for the consideration of one dollar ($1) a tract of land at Shelby, Alabama, of adequate size and suitable location for the erection of the plant hereinafter described."

It also requires the government to sell and the Chemical Company to buy the plant at its fair market value, but the "obligation of the government to. sell said plant as in this article provided is conditioned upon its having the legal authority to make such sale and conveyance." Another provision which is considered to be material is as follows:

"It is agreed, however, that in case the government takes over said plant or undertakes to operate it, by reason of the default of the contractor, or for any other reason, the government's right to operate the same shall, except as may be expressly provided by statute, cease and terminate at the end of the present war. If at that time the sale of said plant to the contractor shall have been consummated, the government will surrender possession thereof to the contractor, and if said plant is then still owned by the government, it shall at its own expense, within six months from the end of said war, remove all buildings and equipment constituting such plant, from the ground upon which the same are erected, and shall without further consideration reconvey such ground to the contractor."

The president of the Iron Company testified that he became cognizant of the principal terms of this contract before it was signed; that as first drawn it did not contain the last-quoted provision; and that he insisted that a clause be inserted containing the substance of that provision. This witness did not claim to have had a personal conference with the officer representing the government, but he further testified that before the Iron Company executed its deeds he had examined a copy of the government's contract. On the other hand, the government officer, who was a major in the Signal Corps of the Army, did not testify, and there was no denial that he had actual knowledge of all the provisions of the Iron Company's contract. It was in pursuance of these two contracts that the deeds, upon which the United States relies to establish title, were executed.

The Iron Company spent about $50,000 in changing and equipping its plant, so as to comply with its contract. A plant was constructed on the land that cost the United States $490,000. It was not completed, however, until the latter part of 1919. The war having ended in the meantime, the United States had no further use for acetate of lime or methyl alcohol, and in January, 1919, it entered into a new contract for the sale of the plant to the Chemical Company for $260,000, payable $50,000 cash, and the balance in three annual installments. The United States was declared to be the owner of the land, and was given the immediate right to demand a deed from the Chemical Company, and that company's right to purchase was forfeitable in the event of its default in making any of the required payments.

The Chemical Company made the $50,000 cash payment, and in April, 1919, executed a deed of the land to the United States. It manufactured and delivered charcoal to the Iron Company from the time the plant was completed until March, 1922, but since the last-mentioned date neither it nor any one for it has complied with the Iron Company's

contract. The Chemical Company failed to make any of the deferred payments required by its last contract with the United States, and in January of 1923 was adjudicated a bankrupt.

The land involved in this suit forms a part of the site upon which the Iron Company's manufacturing plant is located, and the new chemical distillation plant is located in the midst of the Iron Company's plant and forms an integral part of it. By this plan of arrangement the Iron Company was enabled to comply at less expense and more efficiently with the government's requirement for wood, water, steam, power, and trackage facilities. The two plants could not well be operated independently of each other. After the Chemical Company ceased operations, the Iron Company made an effort to purchase from the government the buildings and equipment constructed by it, and offered to pay therefor the balance of $210,000 due by the Chemical Company; but the government declined to accept this offer, and instead made a contract to sell the plant at the same price to a competitor in business of the Iron Company.

The District Judge, being of opinion that the officer who represented the government had actual knowledge of the contract between the Iron and Chemical Companies, and of all its provisions, entered a decree denying the relief prayed for in the bill, but granting to the United States the right at its own expense to remove its buildings and equipment within six months from the date of the decree, and requiring at the expiration of that time that possession of the land be surrendered to the Iron Company. The United States appeals.

[1] As between the two companies, the Iron Company became entitled to demand a reconveyance and take possession of the land, because the breach and bankruptcy of the Chemical Company operated as effectually to terminate their contract as if it had expired by limitation of time. The contractor was not prevented from carrying out its agreement to reconvey at the termination of the contract by the clause which made reconveyance dependent upon its obtaining title from appellant, and upon an enabling statute being enacted authorizing the contractor to become the owner of the land, buildings, equipment, and improvements; because it is admitted that the enabling act, therein referred to, was passed. The case turns on the question whether appellant had knowledge or notice of the terms and provisions of appellee's contract. We agree with the District Judge that the attending

facts and circumstances are sufficient to show that the officer representing the government had actual knowledge of such terms and provisions. That the officer knew of the existence of that contract is conclusively shown by the reference in the government's contract to the provision relating to the supply of wood. The contract was available to him, and ordinary care would have demanded a familiarity with its provisions.

It is a fair inference that appellant would not have entered upon an undertaking of such magnitude as this was without first ascertaining whether the contractor would be able to furnish, not only wood, but all the other essentials of successful manufacture, such as water, steam, and power. The Chemical Company had no plant of its own, and the success of its undertaking depended upon its contract with appellee. In no other way could appellant be assured that acetate of lime and methyl alcohol could be manufactured on the scale required by it than by an examination of appellee's contract. That contract provides that the title to the land might be vested in the United States, but only during the war. The government's contract contains a corresponding provision, and it is apparent, not only from the testimony of appellee's president, but also from an examination of appellant's contract, that this provision was not at first inserted, because there is an inconsistent provision to the effect that appellant might retain the plant to a later date, and then convey it to the contractor in the event it should have the legal authority to do so.

A reasonable explanation of this inconsistency is that the clause to the effect that appellant's title should not extend beyond the war was inserted after the contract was prepared. It must have been apparent to the government officer that the Chemical Company was not demanding the change made in the contract on its own account, because it would be a matter of no concern to it whether the title remained in the government or in the Iron Company, since in either contingency its rights were protected by a contract. The government officer must have known, therefore, that an additional provision was being demanded in behalf of appellee, the only other party at interest. In the absence of any denial or explanation, the conclusion is justified that, as appellee had knowledge of the contents of the government's contract, so the government officer had knowledge of the contents of appellee's contract.

[2] But, if it be conceivable that the government officer had no actual knowledge of

appellee's rights, we are of opinion that the facts and circumstances just stated are sufficient to impute notice to appellant of the contents of appellee's contract. Undoubtedly that officer knew that appellee was a party to a contract which affected to some extent appellant's relations with the Chemical Company. "It will not do for a purchaser to close his eyes to facts—facts which were open to his investigation, by the exercise of that diligence which the law imposes. Such purchasers are not protected." Brush v. Ware, 15 Pet. 93, 111, 10 L. Ed. 672. In Livingston v. Maryland Insurance Co., 7 Cranch, 506, 3 L. Ed. 421, it is said (page 538): "It is a general rule that a paper, which expressly refers to another paper within the power of the party, gives notice of the contents of that other paper." Simmons Creek Coal Co. v. Doran, 142 U. S. 417, 12 S. Ct. 239, 35 L. Ed. 1063, is to the same effect. See, also, 20 R. C. L. 353.

[3-5] Authorities are cited to the proposition that the government is not bound by the laches or neglect of its agents, but they have no application where the effect of notice is involved. The government is as much bound by notice to one of its agents as is an individual or private concern. It comes into equity as any other suitor, when it seeks to assert rights to property. Brent v. Bank of Washington, 10 Pet. 596, 9 L. Ed. 547. The clause in appellant's contract, already copied above, with reference to reconveyance, clearly discloses the intention that at the end of the war the rights of the government in the land and the plant should cease. Appellant itself agreed that it should have no further right than to remove its buildings and equipment within six months, and that it would thereupon reconvey the property. Having obtained title under the terms of the contracts, and with notice or knowledge of appellee's rights, appellant could not thereafter acquire a title free from such rights by taking a deed from the Chemical Company. It never was contemplated by either contract that appellant should have the right to continue to own the land or to convey it to a stranger.

[6] Appellee offers to pay the fair and reasonable value of the buildings and equipment, and more cannot equitably be required of it. Of course, appellant cannot be compelled to accept that offer, and is within its rights if it chooses to dismantle and remove that part of the plant which it caused to be constructed.

The decree of the District Court is affirmed.