## PUTNAM *v.* OSGOOD.

Where, on a mortgage of a stock of goods in a country store, it was agreed, verbally, that the mortgagor should continue in possession of the store and goods, and sell the goods as before for his own benefit, and he did so,—it was *held*, that such an arrangement was inconsistent with the avowed object of the mortgage, and rendered it fraudulent and void as to the mortgagor's creditors.

Where the mortgagee was indebted to the mortgagor on account, and it was agreed that the amount should be applied in part payment of the notes held by the former against the latter, and the accounts were thereupon discharged with the assent of both parties, it was *held* that this was equivalent to a payment in money upon those notes.

Under the law requiring an account of the amount due upon the debt or demand secured by the mortgage, an account of the liabilities so secured must be given.

An account rendered by a mortgagee to an attaching creditor is not necessarily *false* within the meaning of the statute, because, by mistake, it is made greater than the amount really due, provided the account is rendered in perfect good faith, and with all reasonable efforts to make it just and correct.

THIS is replevin, by Alonzo W. Putnam against Joseph D. Osgood, for a stock of goods attached by the defendant on a writ in favor of one Blaisdell against one Child, the plaintiff claiming under a mortgage from said Child. The questions of law arise upon the supplemental report and additional report of an auditor, by agreement of parties.

## SUPPLEMENTAL REPORT.

The auditor, in the action Alonzo W. Putnam against Joseph D. Osgood, having made a general report, makes at the same time a supplemental report, as follows : It was agreed by the parties at the hearing, that the auditor should, in a separate report, find the facts upon the various questions in controversy between the parties, for the purpose of raising any questions of law which may arise thereon.   I therefore find the following to be the material facts of this case, viz. :

1. On the 8th day of February, 1867, Parker M. Child made a mortgage of personal property to the plaintiff, executed in due form of law.

2. The property mortgaged was described as follows in the mortgage, viz. : "all my stock of goods, and merchandise of every description, now in my store and barn in said Haverhill; my horse, being the only one I own; my three wagons, one of them an express wagon and the two others gig wagons; my traverse sleigh—being all the articles of those kinds I own; and all the wood lately bought by me of William C. Wetherbee, now being partly on said Wetherbee's land and partly on or near the line of the B. C. and M. Railroad, and all in said Haverhill, and being about one hundred cords, be the same more or less; also, my three single sleighs, being all the sleighs I own."

3. The following is a copy of the condition of said mortgage, viz. :

"Provided, nevertheless, that if I, my executors, administrators, or assigns shall pay or cause to be paid unto Putnam, his executors or administrators, my promissory note of even date herewith for thirty-seven hundred dollars, payable to said Putnam or order, on demand, with interest annually, according to its tenor, and shall seasonably pay a note for two thousand dollars payable to George Leslie or order and not yet due, bearing interest annually, and signed by myself and Dwight P. Child and said Putnam, in which note said Putnam is my surety, and shall indemnify said Putnam, his heirs and executors and administrators, against said last mentioned note, then these presents shall be void."

4. On said 8th day of February, said P. M. Child was the owner of the goods described in said mortgage.

5. All the goods and chattels described in the plaintiff's writ were covered by the description in said mortgage (unless the court shall find said description to be defective), except those articles which are specifically enumerated in my general report in this case.

6. Said mortgage was given and received in good faith, for the purpose stated in said condition.

7. Said note for $3,700 was given at the time of the execution of said mortgage, and was honestly due and owing from the mortgagor to the mortgagee (unless the court shall be of a different opinion, from the facts hereinafter stated), and no part of it has since been paid.

12. On the 22d day of June, 1866, said P. M. Child gave a note to the First National Bank, of Newbury, Vermont, for $2,000, payable in one year from date; and the plaintiff and Dwight P. Child signed said note as sureties.

13. On said 22d day of June, George Leslie was cashier of said bank, and has been ever since.

14. The plaintiff never signed any other note as surety for said P. M. Child.

15. The intention of the parties to said mortgage was to secure the mortgagee for signing said bank note.

16. Said bank note was paid by the plaintiff at about the time it became due.

19. Mr. Putnam, at the time of the execution of said mortgage and until said attachment, supposed there were seven or eight thousand dollars' worth of goods in the store, and it was not his intention to permit the goods to be disposed of to such an extent as to render his security inadequate.

22. The defendant, being a deputy sheriff for Grafton county, attached all the property in controversy on the 22d day of February, 1867, upon a valid writ of attachment in favor of Joshua S. Blaisdell, the cause of action being a just debt for $2,700 and upwards, due from said Child to said Blaisdell.

23. On the first day of March, 1867, the defendant duly demanded of the plaintiff an account, under oath, of the amount of the debt or demand secured by said mortgage, which was due on said 1st day of March.

24. The plaintiff duly furnished to the defendant an account, on oath, setting forth that on said 1st day of March, the amount due on said $3,700 note was $3,712.95, and on said $2,000 note, $2,082.00.

25. This was a true account of the amount due on said notes—unless the court shall be of a different opinion, upon consideration of all the circumstances relating to the application of the sum of $303.65 upon the plaintiff's claim, as hereinbefore and hereinafter stated.

26. On the 23d day of February, 1867, said Child assigned to the plaintiff said account for $303.65, with sundry accounts and notes against other persons, to secure him for his liability as guarantor for Child to Anderson, Heath & Co., of Boston.

27. On said 23d day of February, the plaintiff was liable to said Anderson, Heath & Co., as guarantor for said Child, to the amount of between sixteen and seventeen hundred dollars; and during the months of August and September, 1867, he paid them $1,643.84 in full discharge of said liability.

28. The securities assigned by Child to the plaintiff, on said 23d day of February, including said account for $303.65, were not sufficient to indemnify the plaintiff on account of said last named liability.

29. The failure of the plaintiff to make any indorsement of said $303.65, or any application of it upon the indebtedness of said Child to him, at the time of taking the $3,700 note and mortgage, was not through any fraudulent intent on the part of either of them.

30. The plaintiff had no knowledge or intimation, until sometime in May, 1868, that any of the goods and chattels replevied had been purchased by said Child after the date of his mortgage, although he made

inquiry of Child after the attachment hereinafter mentioned and before the commencement of this action for the purpose of ascertaining.

31. On or about the 23d day of February, 1867, the defendant, the attaching creditor, and his attorney learned that packages of goods had been received into the store by Mr. Child, between the 8th and the 22d days of February; and prior to the date of the writ in this case they ascertained the kinds and quantities of said goods, or the most of them; but it did not appear that either of them had any knowledge, until after the replevying of the goods, that any grain had been received into the store between those dates.

32. They were never inquired of by the plaintiff, nor by any person on his behalf, for information as to goods purchased after the mortgage, nor did they ever communicate to him any information on the subject, but purposely refrained from doing so.

33. The defendant had interviews with the plaintiff, and opportunities to communicate this information to him, and understood that the plaintiff claimed to hold all the goods by virtue of his mortgage.

34. Prior to the date of the writ in this case, the plaintiff demanded all the goods of the defendant, who refused to give them up.

35. It was the purpose of the defendant and of the attaching creditor at all times from the date of the attachment to disregard the plaintiff's mortgage and hold all the property, as well that embraced in the mortgage as that subsequently purchased.

36. The value of all the goods and chattels replevied was, on the 19th day of April, 1867, as follows, viz.,—value of those enumerated in my general report, $328.81; value of those not enumerated, $4,340.27; value of the whole, $4,669.08.

37. If the court shall be of the opinion, upon consideration of the foregoing facts, that the plaintiff, on said 19th day of April, had lawful authority, by virtue of said mortgage, to take the goods and chattels enumerated in my general report from the possession of the defendant, then I assess damages to the plaintiff in the sum of one dollar for the caption and detention of all the goods and chattels mentioned in his writ.

38. But if the court shall be of the opinion that, under all the circumstances stated, the defendant, on said 19th day of April, had a right by virtue of his attachment to hold against the plaintiff's mortgage the goods and chattels not enumerated in my general report, then I assess damages to the defendant in the sum of $4,669.08 on account of the replevying of all the goods and chattels described in said writ, with interest thereon from said 19th day of April.

### ADDITIONAL REPORT.

I amend my supplemental report in this case by striking out the eighth, ninth, tenth, eleventh, seventeenth, eighteenth, twentieth, and twenty-first paragraphs, and substituting therefor the following, viz.:

8. The consideration of said $3,700 note was four notes given by said Child to the plaintiff as follows, viz.:

One for $1000, Oct. 30, 1865 ; one for $800, Jan. 17, 1866 ; one for $580, Feb. 10, 1866 ; and one for $1000, June 16, 1866 ; some items of account, and $47 in money which was then loaned by the plaintiff to said Child ;—no part of either of said sums having ever been paid, except as is hereinafter stated.

9. On the 19th day of December, 1866, the plaintiff, being indebted to said Child upon two separate accounts in the sum of $332.98— $171.43 of which was on one ledger and $161.55 on another ledger— was credited $171.43 and $161.55, thus balancing the account upon each ledger ; and it was agreed between them, as it had been previous to December 13, 1866, in relation to upwards of $700 then due on said two ledgers, that Child should get along without the money if he could, and in that event said sum of $332.98 should be indorsed on one of the plaintiff's four notes ; but if Child could not get along without it, the plaintiff agreed to pay said sum.

10. On the 2d or 3d day of January, 1867, $29.33 of this sum having been adjusted in another way, it was agreed between the plaintiff and said Child that the remainder ($303.65) should be indorsed on one of the plaintiff's said notes ; but neither of the notes was present, and there was no agreement on which note the indorsement should be made.

11. No indorsement of said $303.65 was ever made on any of said notes, nor did said Child ever request the plaintiff to make the indorsement, or give him any notice on which note to make it, nor did the plaintiff and Child ever revoke said agreement to indorse said sum of $303.65 on one of said notes, except so far as their acts in giving and receiving a new note for the whole amount of the old notes and interest amounted in law to a revocation ; and when the sum due on said four notes was computed at the time of the execution of said mortgage, the circumstance of said alleged payment was not thought of by either party, and for that reason was not allowed in the computation.

17. There was never any agreement between the plaintiff and said Child, except what may be inferred from their acts and silence, that the mortgagor should be entitled to dispose of any of the mortgaged goods ; but the mortgagor did proceed to sell the stock in trade, in the usual course of business, at his store,—and this was with the knowledge of the mortgagee and without objection on his part,—the aggregate amount of said sales, between the date of said mortgage and of the attachment hereinafter mentioned, being upwards of $600, no part of which was ever paid over to the plaintiff or demanded by him ; but the plaintiff purchased goods from the store between those dates to the amount of about $37, which were charged to him upon account, a large part of which was paid by credits prior to the attachment, and the remainder was assigned to the plaintiff, with other accounts, on the 23d day of February, as stated in my supplemental report.

18. Both the mortgagor and the mortgagee had an understanding, each in his own mind, at the time the mortgage was executed and afterwards, that the mortgagor was to be permitted to carry on trade as

usual in the store, although this understanding was not communicated from either of them to the other until after the 8th day of February, 1867. And nothing was said between them on that subject at any time before said attachment, nor was there any act or neglect of either of them before said attachment, which would have rendered it inconsistent for the mortgagee to have taken possession of all the mortgaged property at any time, had he seen fit so to do; but, from the acts of the mortgagor and the silence of the mortgagee, I find that it was agreed between them, from time to time, between the 8th and 22d days of February, 1867, that the mortgagor should continue business in the store as usual, so long as the mortgagee should make no objection to it.

20. Mr. Child proceeded to replenish his stock by putting into his store, with the goods mortgaged, other goods ordered before but which were received after the execution of the mortgage, and purchased grain from his customers, consisting in part of a quantity of oats which he mixed with oats on hand when the mortgage was executed.

21. This was without the consent or knowledge of the plaintiff; but he had good reason to expect Mr. Child would so purchase other goods and grain, and furnished him, on the 19th of February, 1867, with 235 pounds of beef, to be disposed of in said store, which was credited to the plaintiff on said Child's books, and constituted the principal parts of the credits referred to in the seventeenth paragraph of this report.

*Felton* and *Binghams*, for the plaintiff.

*T. J. Smith*, for the defendant.

BELLOWS, C. J.    The first question is, whether this mortgage, under the circumstances, was originally valid as against the creditor at whose suit the goods in question were attached.

The mortgage was made February 8, 1867, and was of a stock of goods in a country store, together with some wagons, harnesses, sleighs, and wood ; and, from the additional report of the auditor, it appears that at the time it was executed each party had an understanding in his own mind that the mortgagor was to be permitted to carry on trade as usual in the store, although this understanding was not communicated by either to the other until after February 8 ; that the mortgagor did proceed to sell the goods in the usual course of business, at his store, with the knowledge of the mortgagee and without objection on his part; that, between the date of the mortgage and the attachment on February 22, 1867, he sold to the amount of upwards of $600 ; that nothing was said between them before the attachment, nor was any act done or neglected which would have rendered it inconsistent for the mortgagee to have taken possession of the mortgaged property at any time, had he seen fit so to do.

From the acts of the mortgagor and the silence of the mortgagee the auditor finds that, between the 8th and 22d days of February, it

was agreed that the mortgagor should continue business in the store as usual, so long as the mortgagee should make no objection to it.

In the former opinion it was held that if it should be found as matter of fact that the parties had agreed that the mortgagor might continue to carry on his business at that store, and to sell the goods so mortgaged, as before, on his own account, the case would come within the principle of *Ranlett* v. *Blodgett*, 17 N. H. 298 ; and the question is, whether the finding of the auditor comes up to that statement.

It is urged, on the part of the plaintiff, that it does not, because the plaintiff retained the right to take possession of the goods at any time, and because, also, the agreement, whatever it was, was not made when the mortgage was executed, but subsequent thereto.

In respect to the first suggestion, it will be observed that in *Ranlett* v. *Blodgett* the mortgagee's right, as matter of law, to take possession of the goods at any time was unquestionable, because his right under the mortgage could not be controlled by a contemporary parol agreement.

The difference between the two cases is, that in the one it was agreed that the mortgagor might go on and sell the goods on his own account without any qualification, while in the other,—the case before us,—he was authorized to sell them so long as the mortgagee should not object.

It is obvious that, as a device for protecting the property of a debtor from attachment, this method would be equally effective as the other, and the same mischiefs might reasonably be apprehended.

In this way the crops and other personal property of a debtor could be continually protected from attachment, and yet he be allowed the unlimited power of disposal; and this would be wholly inconsistent with the apparent object of the mortgage.

The avowed object is to secure a debt; but an agreement that the mortgagor may sell the goods for his own benefit shows that the real object was, not to secure the debt, but to protect the property.

Such a reservation is a trust in favor of the mortgagor, and as inconsistent with the apparent object of the mortgage as it would be in respect to an absolute sale, and for aught we can see it matters not that the authority to sell is subject to be recalled by the mortgagee.

For the time being the authority is unlimited, and that is clearly inconsistent with the avowed object of the mortgage. The mortgagor is authorized to sell what goods he can, and for his own benefit, until his authority is recalled.

This must be regarded as a trust for the mortgagor's benefit, differing only in extent from the case of an unlimited power of sale, and it differs very widely from the mere retention of the possession. *Ranlett* v. *Blodgett* goes upon the ground that such mortgage, if held to be valid, would serve effectually to cover the property of debtors, the mortgagor being authorized to act as the absolute owner notwithstanding the mortgage; and the court say that the mortgagor, by the agreement, was the owner for all purposes except the rights of creditors, but those

rights cannot be excluded by such an agreement, and they might attach.

The same remarks, for aught we can see, apply in their full force to the case before us.

In *Coolidge* v. *Melvin*, 42 N. H. 510, it was held that any secret trust whatever, by which the property is held in any way for the benefit of the vendor, is inconsistent with an absolute sale, and makes it, as matter of law, fraudulent and void as to creditors.

Such a trust as there is in this case is equally inconsistent with a mortgage. It is true that the plaintiff did not intend to permit the mortgagor to dispose of the goods to such an extent as to render his security inadequate, but still the mortgage was made to cover an amount of goods supposed to be greater than the mortgage debts, and the mortgagor was authorized to sell them for his own benefit; and it may well be assumed that the purpose was to protect them from attachment.

It is urged by the plaintiff that the agreement that Child might sell the goods was not made when the mortgage was executed, but subsequently. It will be perceived, however, that when the mortgage was executed, both parties understood that the mortgagor was to be permitted to carry on the business as usual at that store; and he did so carry on the business and sell the goods, with the plaintiff's knowledge and without any objection by him.

The case in fact stands much like the case of *Coburn* v. *Pickering*, 3 N. H. 415. That was an absolute sale of goods—household furniture—in a tavern; and after the sale, and before the goods were removed, it was agreed that the furniture should be left and used in the tavern by the vendor; and in order to prevent their being taken by the vendor's creditors, the buyer leased them to a hired man of the seller for six months. There was no evidence that this arrangement made any part of the contract of sale, but the vendor testified that the agreement that the goods should be left there was altogether subsequent to the sale.

The court, regarding the lease as a lease in fact to the seller, directed a verdict against the plaintiff to whom the goods were so leased, on the ground that although the leaving the goods with the seller might not have been originally contemplated, yet, as the arrangement was entered into before the goods were removed, the whole must be considered as one transaction and one contract, and that leaving the goods in possession of the seller was conclusive evidence of a secret trust.

On motion for a new trial, the ruling of the court was sustained, and there was judgment on the verdict. The court, per RICHARDSON, C. J., holds that the doctrine urged by the plaintiff's counsel, that the original contract is to form the criterion by which the honesty of the sale is to be determined, stands in opposition to the rules which have been long established in such cases, and is wholly unsupported by authority.

In the case of an absolute sale of goods, the retention of possession

by the mortgagor, if unexplained, is conclusive evidence of a secret trust, such possession being inconsistent with a *bona fide* sale.

The retention of the possession and sale of the goods, with the knowledge of the mortgagee and without objection, is equally inconsistent with the avowed object of a mortgage, and, upon the same principle, would seem to be evidence of a secret trust. So it was held in *Robbins* v. *Parker*, 3 Met. 117, where there was a mortgage of " all the hay, grain, and produce " growing on the mortgagor's farm to secure the payment of a certain sum in one year, but no note or other personal security was named in the mortgage, and the mortgagor used the produce of his farm at his pleasure, with the knowledge of the mortgagee and without objection from him. The court held that the transaction must be regarded as collusive and fraudulent as against creditors.

In that case the court was authorized to make inferences of fact; but the law was laid down as above, suggesting that the property was consumed as if no mortgage had been made, and with the mortgagee's knowledge, and that the conduct of the parties was inconsistent with the object of a mortgage, which is to secure a creditor. See, also, *Divver & al.* v. *McLaughlin*, 2 Wend. 596. If the mortgage had originally been made in good faith and free from any secret trust, it is not clear that it would have been rendered invalid by a subsequent arrangement creating a trust in favor of the mortgagor ; but the case does not raise that question, and it is not necessary to discuss it, for the very question at issue here is, whether the mortgage was originally made in good faith or not.

The property was left in the possession of the mortgagor, both parties understanding that he would continue to sell as usual ; and he did so, with the mortgagee's knowledge and without objection by him. From this evidence the auditor finds that it was agreed he might do so until objection was made ; and although he does not find that the agreement was made when the mortgage was executed, yet he finds it was made from time to time soon after, and finds it from a state of things following immediately on the execution of the mortgage.

We think this may well be considered as all one and the same transaction, as in *Coburn* v. *Pickering*. There the evidence of a secret trust was the retention of the possession by the mortgagor, and the subsequent lease of the goods to the mortgagor while that possession continued.

In this case the evidence of the trust was the retaining of the goods and selling them for the mortgagor's own benefit, and with the knowledge of the mortgagee and without objection,—in accordance with the understanding that each party had when the mortgage was made.

Assuming, then, that the mortgage was made with the understanding on both sides that Child was to continue the business and sell the goods for his own benefit until the plaintiff interfered, we think it clear, both on principle and authority, that the mortgage was invalid as against creditors.

The doctrine of *Ranlett* v. *Blodgett* is fully sustained by the well considered case of *Collins* v. *Myers*, 16 Ohio 547.

In that case, from the mortgage itself, it appeared that the mortgagor was to retain the goods, and continue to sell them at his store until the mortgagee was compelled to pay the debt for which the mortgage was made as indemnity, or he should become fearful that he should be obliged to pay it, when he should be at liberty to take the goods and sell them and apply the avails to that debt.

The court put the decision upon the ground that between the parties it was really no mortgage at all, but only effective to ward off the claims of other creditors; and if such mortgages were held valid, they would afford a complete shelter, under which a man could carry on a trade for his own benefit, completely protected against the payment of his own debts.

The same doctrine is held in New York. *Griswold* v. *Sheldon*, 4 Comstock 580; *Edgell* v. *Hart*, 13 Barb. 380; *Ford* v. *Williams*, 3 Kern. 577; *Wood* v. *Lowry*, 17 Wend. 492.

There are authorities somewhat in conflict with these views: one of the strongest is the case of *Gale* v. *Burnell*, 7 A. & E. (N. S.) 849. That was a mortgage of household goods, cows, horses, and other farming stock, &c., and until default in the condition the mortgagor was entitled to "hold, make use of, and possess" the property. The opinion of the court was by Ld. DENMAN, who held that the term "make use of," applied to perishable property, must mean "*consume.*" But he said the most that can be made of it is, that the stipulation in question may amount to a license to consume such articles; they are still conveyed to the plaintiff; there are no words defeating the original grant, nor any power of selling and disposing of them, or dealing with them generally, as if they had not been conveyed.

So in Massachusetts it has been held that an agreement that the mortgagor may sell part of the property for his own benefit is not conclusive evidence of fraud, but the presumption may be rebutted,—the same as the presumption arising from the retention of possession in the case of an absolute sale. Such is the doctrine of *Briggs* v. *Parkman*, 2 Met. 258, which in its circumstances very much resembles the case of *Ranlett* v. *Blodgett.*

A similar doctrine is held in Maine; but, as suggested in *Ranlett* v. *Blodgett*, the decisions in those States on this subject differ so widely from our own as to have little application to this case.

The doctrine of *Ranlett* v. *Blodgett* was adopted in the former opinion in this case, and we see no reason to depart from it.

It is urged by the plaintiff's counsel that the case of *Ranlett* v. *Blodgett* ought to be reëxamined; that at least it is not applicable under our present statutes, by which a creditor of the mortgagor may attach his interest in the goods mortgaged.

We think, however, that this provision of the statute does not change the law in respect to fraudulent conveyances. It does authorize the attachment of mortgaged chattels, on payment of the debt.

secured by them; and that may diminish somewhat the mischiefs that might otherwise arise from mortgages of the character of the one in question.

Still, the great and controlling objections to them remain. The avowed object of a mortgage is to secure a debt. If the secret purpose be to protect the mortgagor in the enjoyment of the property and enable him to set his other creditors at defiance, then the mortgage is deemed to be fraudulent and void as to those creditors; and of this there is no controversy.

If a trust, inconsistent with the legitimate purpose of a mortgage, is reserved for the benefit of the mortgagor, and that is proved, then a fraudulent intent is, with us and in many other jurisdictions, a conclusion of law.

A secret understanding that the mortgagor shall retain the possession of the goods, and continue to sell them as before for his own benefit, is clearly such a trust.

As between the parties, the mortgagor remains the owner of the goods, and the mortgage is practically effective only to ward off the claims of other creditors.

If such a mortgage should be held to be valid, it would furnish the readiest means of affording shelter to an embarrassed debtor, under which he could carry on his business and defy his creditors.

The practical effect of such a mortgage is to delay and defeat creditors, and it is to be presumed that the parties intended to do what their acts were naturally calculated to accomplish.

The right of other creditors to attach the mortgaged property could afford but little relief against these mischiefs. It could only be done by paying the mortgage debt, which, in many instances, would leave little or nothing for the creditor.

In the meantime, the mortgagor would dispose of the goods for his own benefit and without paying the mortgage debt, and then mortgage the goods, obtained to replenish his stock, to the same friend for the same debt, and so continue his business and be enabled to snap his fingers at his other creditors.

A doctrine which should hold such a transaction to be valid would be most disastrous in its consequences, and finds no countenance in the established doctrines on the subject either here or elsewhere.

It is upon principles and views like these that the decisions we have cited are based.

It is urged that the description of the goods in the mortgage is insufficient, and that the description of the $2,000 note in the condition of the mortgage is imperfect; but we are satisfied that in both respects the description is sufficient.

It appears from the case that the plaintiff was indebted to Child on account, entered upon two ledgers, and that on December 19, 1866, the plaintiff was credited on those ledgers with an amount sufficient to balance the same; and it was then agreed, as it had been previously, that Child should get along without the money for these accounts if he

could, in which case the amount was to be endorsed on one of the notes for which the $3,700 note was given; but if Child could not get along without the money, the plaintiff was to pay it.

It does not appear that the money was called for, or whether Child could or could not get along without it, but the money was not, in fact, paid or endorsed on either of the notes ; neither does it appear that the credits on the ledgers were made by agreement with the plaintiff, or with his knowledge or assent, although such agreement or assent may not be improbable.

· The court, however, is not authorized to make any inference of fact, and therefore it must be assumed, simply, that it was agreed that the amount of these accounts should be endorsed upon one of the notes if Child could get along without the money. This clearly was not payment at that time ; it was not even an absolute agreement that it ever should be payment ; but the most that can be said is, that there was an executory agreement that the amount should be endorsed on one of the notes upon condition that Child did not need the money. How that would be remained to be seen.

The transaction certainly was not payment. at that time ; and the question is, whether we can find that the state of the case had changed subsequently so as to become payment.

· Upon the whole, we think it must be regarded as a question of fact, which we cannot here determine, whether it was understood and agreed by the parties that the accounts should be discharged and the amounts be taken and deemed as payment absolutely in part of the mortgagor's debt to the mortgagee, and the accounts were so discharged by the act of both parties ; or, if there was a condition, if that condition was afterwards relinquished and the agreement then made absolute that the amounts should be part payment.

· If the substance of the transaction had been that upon ascertaining the amount due on the accounts the parties agreed that the sum found due should be applied in part payment of the notes held by the plaintiff, and that the accounts should then be discharged, and they were so discharged, we think it must be treated as part payment of Child's notes. It would stand much the same as if the plaintiff, instead of a verbal promise to apply the amount, had given a receipt for it as part payment, engaging to endorse it upon one of the notes.

The acceptance of the discharge of the accounts as an accord and satisfaction would stand, for aught we can see, upon the same footing as the acceptance of some specific article, or a conveyance of land.

The payment may be by any lawful means agreed upon by the parties, and intended by them to be payment—2 Greenl. Ev., sec. 519; and it may as well be by the discharge of an account, as the payment of money or other things. The question is, Was the discharge of the accounts the act of both parties and accepted as payment *pro tanto* of the plaintiff's claims ?

Should it turn out that there was merely an executory agreement to allow these accounts in this way, and that it was never consummated,

it would not be payment; but if the parties agreed that the accounts should be discharged and regarded as paid, and the amount applied in payment of the notes held by the plaintiff, and to take effect at once, it would be payment. Analogous to this is the case of an agreement between A, B, and C, by which A, being indebted to B, assumes B's indebtedness to C, and is received by C as paymaster,—and in this way A's debt to B is paid. *Morse* v. *Allen*, 44 N. H. 33, and cases cited.

The next question respects the rendering an account of the sum due on the mortgage.

The mortgage was made February 8, 1869, and, under the Revised Statutes then in force, a creditor of the mortgagor might attach the property, and demand of the mortgagee an account on oath of the amount due upon the debt or demand secured by the mortgage, and if such account was not given in fifteen days, or if a false account was given, the property might be held discharged of such mortgage.

Two questions are raised by the plaintiff's counsel under these provisions :

1. Whether any account of the amount of *liabilities* secured by the mortgage is required ; and, 2. Whether an account can be regarded as false, within the statute, when the inaccuracy was owing merely to mistake, and was not wilful.

In respect to the first of these questions, it is urged that " an account of the amount due upon the debt or demand " does not fairly embrace the liability of the mortgagee on a debt or demand due to another, and therefore, in view of the practical difficulty of rendering an accurate account of the amount of such liability, the reasonable construction is that no such account is required.

This construction, however, we cannot adopt, and for reasons which we shall proceed to state.

The next preceding section of the Revised Statutes, ch. 184, sec. 15, provides that any personal property, not exempt from attachment, but subject to any mortgage, pledge, or lien, may be attached in a suit against the general owner, " the creditor or officer paying or tendering to the mortgagee, pledgee, or holder the amount for which the property is holden, as ascertained in the mode provided in the following section ; " and then comes the provision for an account of the amount due upon the debt or demand secured. It is obvious, then, that the law contemplates the payment of the amount for which the property is holden, whether a debt or liability, and the method provided for ascertaining that amount is this account required of the mortgagee. The creditor is to pay the amount for which the property is holden, as ascertained by this account, and therefore we think the terms debt or demand were used by the law-makers in a sense which includes everything for which the property may be holden.

A different construction would cause great embarrassments, as it would throw upon the creditor the responsibility of determining the amount of an existing liability without the aid of the person most interested in knowing the amount, and in many instances would

wholly defeat the object of these provisions, namely, to subject all mortgaged property to attachment.

It is true, it might in some cases be difficult for the mortgagee to state with accuracy the amount of his liability, but it would be more difficult for the creditor to do it, especially without the mortgagee's aid. It is evident, however, that the legislature did not regard the difficulty of rendering such an account as insuperable, for it is distinctly provided that a mortgage to indemnify against such liability shall state truly and specifically such liability, and that its validity, truth, and justice shall be verified by the oaths of the parties.

. Without such a description of the liability as to give information of its nature and amount when the mortgage was made, the mortgage would be invalid—*Page* v. *Ordway*, 40 N. H. 256; and in this respect debts due the mortgagee and his liabilities for the mortgagee are put upon the same footing, it being required in both cases that the extent of the claims secured should be truly set forth.

A strong inference is afforded by this in favor of the construction suggested, namely, that the terms " debt or demand " include anything for which the property is holden ; at least, it tends to show that the legislature contemplated no serious difficulty in rendering an account of the amount of the liability at the time the account was demanded. It must be done substantially when the mortgage is made, and it is not easy to perceive any material increase of difficulty at the time of demanding an account.

Among other objections to the construction urged by the plaintiff, is this : it would afford a ready means of creating obstacles in the way of attaching personal property, that would be likely to be attended with serious mischiefs.

Again: it is urged by the plaintiff's counsel that as the mortgagee cannot be compelled to render an account of his liability, the creditor has no right to pay to the mortgagee the amount of it. If that should be the result of his position, either in law or in its practical effect, it would afford an additional argument against his position that no account of liabilities could be demanded,—because we think it is clearly the policy of these provisions to subject all personal property mortgaged to attachment, unless exempt.

A similar question has arisen in Massachusetts, under their Revised Statutes, ch. 90, secs. 78, 79, which authorizes the attachment of personal property mortgaged, provided the creditor shall pay to the mortgagee the amount for which the property is liable within twenty-four hours after the same is demanded, and also providing that the mortgagee, when making such demand, shall state in writing a just and true account of the debt or demand for which the property is liable to him.

In the case of *Haskell* v. *Gordon*, 3 Met. 268, the mortgage was to secure the payment of a promissory note described in the condition, and to indemnify the mortgagee against other notes signed by him as security for the mortgagor.

It was held that the mortgagee was bound to state the extent of his

claim for indemnity, although in some cases it might be attended with much practical difficulty; but the court say that he cannot be required to give a more exact account than the nature of the case reasonably admits; yet he can state the general character of his demand and the particulars and extent of the lien, just so far as it may have assumed a certain and definite shape.

As suggested in that case, there may be many instances,—and the case before us is one of them,—where the extent of the liability is readily ascertained, and where, on payment of that sum, assets to a substantial amount may be secured by a creditor.

It will be observed that the suggestions made in *Johnson* v. *Sumner*, 1 Met. 176, were distinctly overruled in *Haskell* v. *Gordon*—which fully confirms the views we have expressed—giving to the terms " debt or demand" a similar construction. The doctrine of *Haskell* v. *Gordon* is also confirmed by *Codman* v. *Freeman*, 3 Cush. 310, 311,—although that case also holds that if no money is actually due to the mortgagee, as where the mortgage was to secure the payment of rent which had not then become due, the creditor could not attach and hold the property.

The remaining question is, whether an account rendered by a mortgagee must be deemed to be false within the statute, because by an innocent mistake it exceeds the amount justly due.

In many cases, with the greatest care and the most perfect good faith, it would be difficult to avoid all errors. In the mathematical computations of interest even, unusual skill and accuracy are often required, together with the determination of many intricate and perplexing questions of law. To hold, therefore, that a slight mistake unfavorable to the creditor, however innocent it might be, would be a fatal defect in the account, and operate to discharge the mortgage, would be a great hardship upon mortgagors, and would often operate to defeat the ends of justice.

The statute, indeed, is highly penal, and should not be extended by construction to cases not clearly within its provisions. *Ricker* v. *Blanchard*, 45 N. H. 46; *Barton* v. *Chellis*, 45 N. H. 137.

The provision of the statute is, that if an account of the amount due be not given in fifteen days after demand, or if a false one be given, then the property may be holden discharged of the mortgage.

The first law authorizing an attachment of personal property mortgaged was that of December 12, 1832, ch. 91. This law provided that any creditor desiring to attach such property might demand of the mortgagee, in writing, on oath, a just and true account of the amount due upon the debt or demand secured; and if he unreasonably neglect to render such account, and shall receive from such creditor more than is justly due, he shall be liable to refund the excess with twelve per cent. interest; and this was the only penalty. On the revision of this law, the penalty was the loss of the entire security; but it was for the failure to render any account, or for rendering a *false* account—not for failing to render a just and true account, as in the former law; and

the question is, in substance, whether in this change of terms a change in the substantial character of the act, which was visited with this severe and increased penalty, was contemplated. In the former, the act was the failure to render a just and true account; in the revised statute, the rendering a *false* account.

It is quite obvious that the term *false account may* be construed to mean an account which is morally false,—known to be untrue; and this, we think, is the more common and ordinary meaning of the term;— and so it is understood in Bouvier's Law Dictionary, where the word *falsehood* is defined to be "a wilful act or declaration contrary to truth," as the more common meaning.

If the revision of the law of 1832 had used the term *false account* in the sense of an account not *just* and *true*, we should naturally expect that they would have retained the language of the former law, instead of using a term which, to say the least, must be regarded as equivocal; and in view of the greatly increased severity of the penalty, we think it reasonable to suppose that the change in the terms was designed to denote a graver offence, and one involving moral turpitude.

Independent of the law in question, there is not much in the Revised Statutes to indicate in what sense the term *false account* was used.

In the law in relation to personal mortgages, providing for the affidavit of the parties, it is enacted that all wilful falsehoods committed in any such affidavit shall be deemed perjury, and punished accordingly; and the argument is, that if the term false account had been used in the sense of a wilfully false account, it would have been so expressed, as in respect to the affidavit. There is, we think, some force in this argument, but it is diminished very much when it is considered that the object of that provision was to subject the parties swearing falsely to such affidavit to punishment for the crime of perjury, and that the terms used were such as belong to the ordinary definition of that offence.

No case has been cited where the construction of the term " false account " has been drawn in question in this State, and we have found none.

It has been held that the object of the statute requiring the account was to enable the creditor or officer to tender the exact sum for which the goods are held under the mortgage.  *Gilmore* v. *Gale*, 33 N. H. 410 ; *Page* v. *Ordway*, 40 N. H. 258.

In the former case, the account was held to be invalid as giving only the amount due to the plaintiffs instead of the amount due on the mortgage debt, which had been assigned to the plaintiffs as collateral security;—and this was held to be erroneous and the lien under the mortgage defeated, although there was no evidence that the error was intentional; on the contrary, the amount due the plaintiffs was much less than the mortgage debt.

No question was raised, however, as to the effect of the account being rendered in good faith ; and it does not seem to have been considered

in any case except that of *Duncklee* v. *Gay*, 39 N. H. 292, where it was held that stating the amount due at less than it was in fact, was not a fatal defect such as would defeat the mortgage.

Under the Massachusetts statute before referred to, where the mortgagee was required to state in writing a *just and true* account of the debt on demand for which the property is liable, questions similar to this have arisen.

In *Rowley* v. *Rice*, 10 Met. 12, 13, the mortgagee demanded fifty-two dollars more than was due. The court, per DEWEY, J., laid down the rule to be, that, to avoid the effect of such error, it must appear that it resulted from accident or mistake, and that the attaching creditor was not misled by the mistake to his injury, as by showing that the value of the property mortgaged was less than the true sum due. The same doctrine was held in *Harding* v. *Coburn*, 12 Met. 341, and in *Hills* v. *Farrington*, 6 Allen 80.

These cases have gone upon the ground of the hardship and injustice of defeating a mortgage security by reason of an innocent mistake in rendering an account of the amount due, when the error was unsubstantial in amount, and could not have misled the creditor.

It will be observed, too, that this is in a case where the mortgagee was required to render a *just* and *true* account; and that is much stronger in favor of the creditor than the case under our statute, where the lien of the mortgagee is lost if he render a *false* account.

Upon a careful consideration of our statute provisions, we think an attaching creditor is entitled to an account rendered by the mortgagee, in perfect good faith, and with all reasonable efforts to make it just and correct; and that if the account be rendered for more than is justly due, and the error is wilful, or caused by bad faith, or by culpable negligence or carelessness which would imply bad faith, then his lien shall be discharged.

If, on the contrary, the error be unintentional, and the result of pure accident or mistake, and without culpable negligence, the mortgagee would not lose his security; but if the creditor paid more than was due, he would be entitled, on discovery of the fact, to recover back the excess as being money paid under a mistake of fact.

In determining whether the mortgagee had used reasonable diligence to make out a just and true account, all the circumstances of the case should be considered, including the extent of injury to the creditor to be caused by an erroneous account.

With this construction we think the rights both of mortgagees and creditors would be reasonably protected, the former being responsible for the exercise of good faith and reasonable diligence in furnishing creditors with such information as to enable them to act safely in respect to such mortgaged property.

*Case discharged.*