UNITED STATES of America

v.

BOSTON AND BERLIN TRANSPORTA-TION COMPANY, Inc., Romeo J. Lavigne, The Francis H. Curtin Insurance Agency, and Catherine M. Nevins.

Civ. A. No. 1674.

United States District Court
D. New Hampshire.

Nov. 13, 1964.

See also 188 F.Supp. 304.

Louis M. Janelle, U. S. Atty., John D. McCarthy, Asst. U. S. Atty., Concord, N. H., for plaintiff.

Walter D. Hinkley, Lancaster, N. H., for Boston and Berlin Trans., Inc., J. L. Blais, Berlin, N. H., for Romeo J. Lavigne, Arthur O. Dupont, Berlin, N. H., for The Francis H. Curtin Ins. Agency.

Robert D. Branch, Concord, N. H., for Catherine M. Nevins.

CONNOR, District Judge.

This was a trial, without a jury, of the issues remaining between the United States of America as plaintiff and Catherine Nevins as intervening defendant, and represents the last stage of a suit for tax lien enforcement which commenced eight years ago. The fund in which both present litigants claim priority is held in an escrow account in the Berlin Savings Bank & Trust Company in the name of J. L. Blais, trustee for Romeo J. Lavigne. These funds in escrow constitute the remaining assets of the Boston and Berlin Transportation Company, against which the tax liens herein are being asserted.

The factual background leading up to the present trial is as follows. The Boston and Berlin Transportation Company, hereinafter referred to as the corporation, borrowed $13,900.80 on December 14, 1951, and executed a mortgage on its rolling stock as security. Because of the insecure financial condition of the corporation, Mrs. Catherine Nevins was required to sign the note as "co-maker" in her individual capacity.[1] The mortgage was duly recorded in the City Clerk's Office in Berlin, New Hampshire, on December 17, 1951; and two days later the note and mortgage were assigned for value to the Howard National Bank & Trust Company of Burlington, Vermont, hereinafter referred to as the bank.

On February 15, 1952, the corporation entered into a contract to sell its motor carrier business, including the mortgaged rolling stock, to Romeo J. Lavigne for $27,000.00. The terms of the contract provided that Lavigne would pay to the mortgagee bank the balance due on the note, and would pay the rest of the $27,000.00 consideration to the corporation. The mortgagee bank agreed to this transaction. There was no novation effected on the note; the mortgage was in no way altered.

From March through November, 1952, a series of tax liens against the corpora-

tion were duly filed. On June 8, 1953, the note and mortgage were assigned to "Arthur O. Dupont att. for Romeo J. Lavigne." At some time in 1953, Lavigne ceased making payments under his contract of purchase, but on May 26, 1954, he gave a note to the corporation in the amount of $12,685.12, the unpaid balance. On May 19, 1955, the District Director of Internal Revenue at Portsmouth, New Hampshire, caused to be served on Lavigne a notice of levy to secure the collection of taxes claimed to be due from the corporation. From that date, the weekly payments by Lavigne were deposited in Savings Account No. 27159 at the Berlin Savings Bank and Trust Company. These weekly payments of principal and interest amounted to $5,400.21 and constitute the escrow fund here in dispute. The amount now totals over six thousand dollars.

The validity of the tax lien of the United States is not here disputed. Mrs. Nevins intervened as a defendant in the proceedings, however, to assert a prior claim to the funds in escrow by virtue of her position as putative assignee of the mortgage on the rolling stock of the corporation. Mrs. Nevins claims, in effect, that she made certain payments to the bank on the note, that she subsequently became the assignee of the mortgage and note, and that the assignment of the mortgage gives her a secured interest in the assets of the corporation.

In passing upon the claim of Mrs. Nevins, there are five issues of fact and law which must be inquired into: (1) the amount of her payments on the note; (2) her status with respect to the note; (3) her status with respect to the mortgage; (4) the priority as between the mortgage and the tax lien; and (5) the relation between the security represented by the mortgage and the actual funds held in escrow.

■ (1) Attorney Arthur O. Dupont was the only witness who testified at the trial. It appears that, with respect to the

---

1. Mrs. Nevins and her husband were the sole stockholders of the corporation; upon the death of Mr. Nevins, Mrs. Nevins became sole stockholder.

transactions involved in this litigation, Dupont acted simultaneously as agent for Mrs. Nevins, the corporation, and Romeo Lavigne. Dupont testified that he handled through his trust account funds advanced by Mrs. Nevins and funds paid by Romeo Lavigne, that he kept track of these funds in separate ledger accounts, and that he channeled these funds to the bank, to the corporation, and to the corporation's creditors on behalf of the corporation. Dupont testified that in this manner Mrs. Nevins had advanced substantial sums to shore up the sagging finances of the corporation. Various figures were mentioned during the course of the trial as being the contributions of Mrs. Nevins. The only advances relevant here, however, are these made by Mrs. Nevins in payment of the note to the bank. Dupont's final testimony with respect to these note payments was that she had paid the first nine installments on the note, from January through September, 1952, and that these payments totaled $5,200.70.

Evidence tending to counter Dupont's assertion took two forms. The answers to interrogatories submitted by Lavigne in 1956, two years before Mrs. Nevins intervened, state that Lavigne paid to the bank the entire amount of the mortgage between September 15, 1952, and June 10, 1953. A financial statement of the corporation furnished to the Internal Revenue Service on October 30, 1953, and signed by both Dupont and Mrs. Nevins, states that Lavigne had been making the payments to the bank. Dupont was unable to supply a satisfactory explanation for these two exhibits. He did state, however, that Mrs. Nevins must have made the payments because the corporation had no money to do so, and because Lavigne was not legally permitted to do so until September, 1952. He also produced a check representing payment of the second and third installments, which check was drawn on his trust account from funds held in the name of Mrs. Nevins in her individual capacity. He further pointed out that the last payment to the bank listed by Lavigne and equalling nine installments on the note was dated June 10, 1953, or two days after the bank had assigned the note to Dupont. Dupont's testimony was also to the effect that Mrs. Nevins had not received any reimbursement for her payments.

On the basis of the above testimony, I find that Mrs. Nevins did make the first nine payments on the note to the bank and that she has not been reimbursed for these payments. I further find that the figures presented by Lavigne are reliable to the extent that they represent the amounts of money paid by Lavigne. I find, however, that the payments by Lavigne were made not directly to the bank, but rather were disbursed to and through the trust accounts of Dupont. How much of Lavigne's payments were allocated by Dupont to the bank, to the corporation, and to the corporation's creditors, remains, due to Dupont's ambiguous status, somewhat of a mystery. I further find that Dupont's hasty mathematical calculations on the witness stand are slightly inaccurate, and that the amount of the nine installments ($579.20 each) is $5,212.80 rather than $5,200.70 as testified.

▇ (2) Although the face of the note in question contains the signature of Mrs. Nevins as "co-maker," Dupont testified that she signed the note only because she "didn't have much choice"; that otherwise the corporation would not have received the loan. Under these circumstances, I find that Mrs. Nevins signed the note not as a principal obligor, but as a surety. Cf. Derry Bank v. Baldwin, 41 N.H. 434 (1860); Grafton Bank v. Kent, 4 N.H. 221 (1827).

▇ (3) Dupont testified that, although the assignments of the note and mortgage were to himself at "att. for Romeo J. Lavigne," he was in fact acting as agent for Mrs. Nevins as well. On this basis, Mrs. Nevins claims that she is now the assignee of that mortgage. Several interesting problems concerning the ownership and the extent of the security are suggested by this purported assignment; but as this purported assignment

is not the controlling factor here, I find it unnecessary to explore them. I do find the purported assignment significant, however, as evidence indicating that at least some of the payments made on the mortgage note were not intended to discharge that instrument.

■■ It is a familiar principle of New Hampshire law that, where justice so requires, the payment of a mortgage note will be considered not as a discharge, but as an assignment of both instruments; this is particularly true where it is the intention of the person making payment to take an assignment of the instruments for his own protection. Rossiter v. Sanaghiaro, 78 N.H. 484, 102 A. 759 (1917). Cf. also Caraway v. Jean, 97 N.H. 506, 92 A.2d 660 (1952); Laconia Savings Bank v. Vittum, 71 N.H. 465, 52 A. 848 (1902); Willard v. Harvey, 5 N.H. 252 (1830); Marsh v. Rice, 1 N.H. 167 (1818). This principle finds application in the case of a surety whose payment of a note is intended not to discharge the obligation and the security altogether, but to effect an assignment as against the promisor. Under such circumstances, the surety is considered to receive an assignment of the mortgage, whether it be considered as security for the note (if the note be deemed not discharged), Low v. Blodgett, 21 N.H. 121 (1850); or whether it be considered as security for the surety's right of indemnification from the principal debtor (if the note be deemed extinguished), Dearborn v. Taylor, 18 N.H. 153 (1846).

■ On the basis of the foregoing, I find that Mrs. Nevins, as surety, intended that her payments on the note operate to assign, rather than to discharge, the mortgage. I, therefore, find that she is an assignee of the mortgage and that the mortgage serves to secure her claim against the corporation for the nine payments which she made on the note.

■■ The United States has interposed an objection concerning the mortgage which should be treated at this point. It is the contention of the Government that the mortgage under which Mrs. Nevins claims is void because the mortgagor corporation and the mortgagee bank agreed to a sale of the mortgaged property. The Government founds its objection upon N.H. RSA 360:21 and the cases of Putnam v. Osgood appearing in 51 N.H. 192 (1871) and 52 N.H. 148 (1872). The Government's contention, however, misconceives the scope and purpose of the rule advanced in the authorities cited. The arrangement which the statute and cases seek to discourage is the type of secret agreement between a mortgagor and mortgagee whereby the former is free to sell the mortgaged property for his own benefit; this is deemed inconsistent with the public manifestation that the property is subject to the control of the mortgagee and is, therefore, considered a potential occasion of fraud upon the creditors of the mortgagor. Thus, a mortgage is held to be void as to creditors where there exists an agreement between the mortgagor and mortgagee with "the secret purpose * * * to protect the mortgagor in the enjoyment of the property and enable him to set his other creditors at defiance * * *." Putnam v. Osgood, 51 N.H. 192, 202 (1871). Otherwise, the "personal property of a debtor could be continually protected from attachment, and yet he be allowed the unlimited power of disposal; and this would be wholly inconsistent with the apparent object of the mortgage." Putnam v. Osgood, supra, at 198.

The present case is not one to which the foregoing principle applies. Here there is no sham mortgage allowing the mortgagor full beneficial use of his property to the fraud of his creditors. Here there is no secret agreement negating the apparent import of the mortgage itself. The sale here in question arose not through any secret subsisting power of the mortgagor, but through the subsequent consent of a bona fide mortgagee to a separate and distinct transaction designed to alter the relationships of the parties to the ultimate benefit of the mortgagee. Under the contract of sale, the proceeds were to be applied toward

the note and mortgage in question, with the balance being paid to the mortgagor. The transaction was under the control of the mortgagee and redounded to the benefit of the mortgagee. Additional beneficiaries of the transaction were the creditors of the mortgagor who, through the sale of assets, were ultimately provided with at least a limited fund to satisfy their claims in what was otherwise becoming an increasingly hopeless situation. Clearly, then, this was not an arrangement whereby the mortgagor retained full authority to dispose of his mortgaged property for his own benefit, as envisioned by the authorities bolstering the Government's contention, and the mortgage can scarcely be voided on that account. Cf. Wilson v. Sullivan, 58 N.H. 260 (1878).

It remains, then, to consider the priorities attaching to the mortgage and the extent to which the escrow funds represent proceeds from the sale of the collateral subject to the mortgage.

■ (4) Inasmuch as the taxpayer corporation is insolvent, the debts of the United States must be satisfied first. 31 U.S.C. § 191. To this seemingly absolute priority of the Government, there are, however, certain judicially recognized exceptions. It has long been held that a prior sale or mortgage by the taxpayer is not affected by the Government's statutory priority; and certain other classes of prior transfers and liens may also fall within this judicially maintained haven of immunity from the operation of the statutory priority. See, e. g., Brent v. Bank of Washington, 35 U.S. (10 Pet.) 596, 9 L.Ed. 547 (1836); Conard v. Atlantic Insurance Co., 26 U.S. (1 Pet.) 386, 7 L.Ed. 189 (1828).

■ All but one of the tax liens in the present case attached between March and November, 1952, and were thus clearly subsequent to the execution of the mortgage on December 14, 1951. 26 U.S.C. § 6322. The mortgage is thus not affected by these liens.

■ The first tax lien in this case stands on slightly different footing, how-

ever. Although not filed until March 18, 1952, it attached to the corporation's property prior to the execution of the mortgage in December, 1951. Were it not for remedial legislation to the contrary, the case of United States v. Snyder, 149 U.S. 210, 13 S.Ct. 846, 37 L.Ed. 705 (1893), would compel the harsh result that the unfiled "secret" tax lien would prevail over the subsequent mortgagee. In 1913, however, Congress enacted statutory protection for such "gap" purchasers and mortgagees by providing that no federal tax lien would be valid as against them unless filed. 26 U.S.C. § 6323. Indeed, the sweeping language of the statute may be broad enough to protect not only "gap" mortgagees, but also prior mortgagees as well, although, as discussed above, the latter were already afforded ample protection by the courts. Thus, none of the tax liens in the present case take priority over, or affect, the mortgage in question; and Mrs. Nevins, as assignee of the mortgage for value, thus becomes entitled to prior payment, to the extent of her claim, out of the proceeds of the property subject to the mortgage. See United States v. Boyd, 246 F.2d 477 (5th Cir. 1957).

■ (5) No little difficulty is encountered, however, in tracing the proceeds from the sale of the property subject to the mortgage. The $27,000.00 contract price, paid in full by Lavigne, represented consideration not only for the rolling stock, but for the other assets of the corporation as well. No evidence was introduced as to the value of the trucks on the date of sale or as to the value assigned to the trucks as part of the transaction of sale to Lavigne. The only value figure in evidence which is associated with the rolling stock is the $13,900.80 figure representing the note for which the trucks stood as security. While it might normally be expected that the collateral would substantially exceed in value the amount of the obligation secured, this court is in no position to conjure up the correct proportions of hypothetical commercial normalcy, or, indeed, to determine that the secured transaction

here involved was, in fact, a normal one. I, therefore, find that the proceeds of the trucks serving as collateral amounted to no greater part of the $27,000.00 contract price than the amount of the obligation they secured—$13,900.80.

The $13,900.80 in question was to have been paid, under the contract of sale, directly by Lavigne to the bank, in satisfaction of the note. This was not done. The entire obligation to the bank was not paid by Lavigne directly, and it seems doubtful whether any of the payments by Lavigne were direct. From the state of the evidence, it appears most likely that the $13,900.80, and the balance of the $27,000.00 contract price alike, were channeled through the trust accounts of Arthur Dupont. Dupont's ledger sheets might have provided sufficient guidelines for the tracing of the proceeds of the rolling stock, but these were not put into evidence. It is left for the court then to arrive at an equitable division of the funds as best it may.

As of June 8, 1953, when the note in question had been paid off, $8,688.00 of the proceeds of the trucks appears to have been channeled to the bank. The balance of the note, $5,212.80, was paid by Mrs. Nevins. The balance of the proceeds from the trucks, also $5,212.80, thus did not go to the bank; and, on the testimony of Arthur Dupont, it did not go to reimburse Mrs. Nevins. Rather, it filtered through Arthur Dupont's trust accounts in some unknown fashion and to some unknown destination. As the escrow fund represents assets of the corporation in the form of the last payments made by Lavigne, it would be harsh to assume that no part of these payments is allocable to the remaining $5,212.80 from the sale of the rolling stock; at the same time, it would be equally unreasonable to find that these last payments by Lavigne are all miraculously traceable as the balance of said proceeds of the collateral.

I find that the balance of the collateral proceeds was not properly segregated and cannot be properly traced, but that said proceeds constituted a proportional amount of all payments made by Lavigne

subsequent to the payment of $8,688.00 to the bank. Lavigne paid $15,386.20 by June 10, 1953; and an additional $13,103.45 in principal and interest pursuant to his own note of May 26, 1954; or a total of $28,489.65. Of this total, $8,688.00 went to pay the bank, presumably out of the proceeds of the sale of the collateral. The $5,212.80 balance of the collateral proceeds was not so segregated, but constitutes a proportional part, or 26.3%, of the remaining $19,801.65 paid by Lavigne. On this basis, I find that 26.3% of Lavigne's final payments are allocable to the sale of the rolling stock covered by the mortgage and that, as such, they are subject to Mrs. Nevins's claim as assignee of the mortgagee.

Judgment is hereby ordered for Mrs. Nevins in the amount of 26.3% of the funds accumulated in the escrow account. The United States of America, as holder of a valid tax lien on the assets of the corporation, is thereby entitled to priority over all other creditors herein (with the exception of Mrs. Nevins). Judgment is ordered for the United States in the amount of 73.7% of the funds accumulated in the escrow account, in partial satisfaction of its tax lien for $6,301.29.