306 F.2d 119
 SOUTHERN RAILWAY COMPANY and Morgan Guaranty Trust Company of New York, as Trustee, Appellants,
v.
UNITED STATES of America et al., Appellees.
UNITED STATES of America, Appellant,
v.
SOUTHERN RAILWAY COMPANY and Morgan Guaranty Trust Company of New York, as Trustee, Appellees.
 No. 19257.
 United States Court of Appeals Fifth Circuit.
 July 19, 1962.
 
 COPYRIGHT MATERIAL OMITTED Earl E. Eisenhart, Jr., Washington, D. C., Emory F. Robinson, Gainesville, Ga., Charles J. Bloch, Ellsworth Hall, Jr., Macon, Ga., Robert B. Thompson, Gainesville, Ga., for appellant, Southern Ry. Co.
 E. D. Kenyon, Wm. B. Gunter, Gainesville, Ga., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Charles L. Goodson, U. S. Atty., Slayton Clemmons, Asst. U. S. Atty., Atlanta, Ga., Frederick E. Youngman, Moshe Schuldinger, Attys., Dept. of Justice, Washington, D. C., for appellees.
 Before BROWN and WISDOM, Circuit Judges, and DE VANE, District Judge.
 JOHN R. BROWN, Circuit Judge.
 
 
 1
 This case is a piece of Americana. It comes face to face with three markers of our early 20th century civilization — railroads, railroad financing, and equity receiverships. And as to the first and third, it marks the end of a railroad and the equity receivership that kept it going for over thirty-five years. Typical of the dissatisfactions which brought about complex bankruptcy reorganization machinery, this receivership seems finally to have become almost an end in itself. And, as with so many others, while well run and contributing undoubtedly to the regional economy, when it is all over, what is left is but a pittance. So small is the salvage that, as another mark of the era, once the expenses of court functionaries and their various counsel were out of the way and the more substantial cumulative claims of the ubiquitous and ever-patient tax collectors, national, state and local, were taken care of, there was nothing left for the ordinary business creditors or, for that matter, even for the mortgage bondholders. On the present order, therefore, the railroad was run for the Receiver and the tax collectors.
 
 
 2
 The Railroad whose demise is memorialized by our decree was the Tallulah Falls Railway Company. It ran for 58 miles from Cornelia, Georgia, up through Tallulah Falls — from whence its name came — and surrounding scenic country, then on through Clayton and Dillard, Georgia, terminating at Franklin, North Carolina. History undoubtedly bears out what we were told, that for a long time this Railroad was the busy and principal means of transportation as vacationers went to and from this popular scenic summer resort area. But it was more important than it was profitable. And, it is an understatement to say, its end — fiscal and physical — was long in coming.[1] On March 10, 1909, all of the properties of the Railroad were put under a first mortgage to secure bond in the amount of $1,519,000. Within a year's time the bonds were in default and never thereafter was a single dime paid on principal or interest. Sixteen years later this Federal Court receivership began in 1926. When the decree of foreclosure was entered, February 28, 1961, this paper debt amounted to $5,430,425. But on a carefully constructed sale by units with extensive advertising across the nation all the railroad brought was $302,000.
 
 
 3
 After first ordering the payment of $35,733.60 for Receiver's, attorneys', commissioners' fees, etc., the balance for distribution was only $262,526.48. Thus the receivership, precipitated in 1926 by the trustee to secure enforcement of the mortgage bonds, ended up with less than a 17% of the original face of the bonds and 4.8% of principal and accumulated interest. But from the standpoint of the mortgage bondholders for whom the suit had been filed, the receivership maintained, and the properties operated, it turned out to be even worse than that. For the Court allowed the tax claims of the United States and various State political entities to share pro rata the whole of this balance as partial, but preferential, payment of their allowed claims aggregating $311,099.30.
 
 
 4
 The disappointed business creditor and the holder of all bonds is now one party, Southern Railway Company. Save for inconsequential amounts denied to the trustee and its New York counsel, Southern is the principal appellant. The Federal Government cross-appeals as to the District Court's allowance of a fee to Charles Bloch, Esq., the local and leading counsel for the trustee, Southern and the bondholders.
 
 
 5
 Southern's claim as a creditor is made up of two principal amounts. The first is the Traffic Balance claim in the net sum of $139,657.52.[2] The other is the Operating Expense claim in the amount of $106,016.65.[3] The District Court, as had the special Master, allowed each of these claims. But it found that the tax claims had a priority over either one or both of them. Consequently, the Court, while impliedly approving the Master's holding that the Traffic Balance claim was not in the nature of a trust fund, held that it was in any event inferior to the tax claims. Thus Southern, as creditor and as bondholder, lost out altogether. As bondholder Southern's principal contention is that the mortgage lien is superior to tax claims so there can be no question of equitable priority or apportionment. Failing in that status, Southern, as creditor, then raises substantially these questions in the main contest between it and the governmental tax claimants. Does the Traffic Balance claim constitute a trust fund entitling it to priority over all other creditor claimants? If not, what is the relative priority as between the tax claims, on the one hand, and either one or both of the claims of Southern, as creditor?
 
 
 Traffic Balance Claim
 
 
 6
 This grows out of the interchange of freight at Cornelia, Georgia, between Southern and the receivership Railroad. The two carriers had a junction settlement arrangement under which freight interchanged was re-billed at Cornelia. On traffic moving inbound to the Tallulah Falls, Southern paid all prior participating carriers their divisions or proportions of the revenue for traffic handled over their lines. For these advances as well as for its own division or proportions of the inbound freight charges, Southern looked to the Receiver for reimbursement and payment. As to such inbound shipments, the Receiver would, and did, collect the freights from consignees. On movements out-bound from the Tallulah Falls, the destination carrier collected the freight charges and paid over to Southern the share due it as well as the Tallulah Falls. The settlement arrangement called for adjustment four times a month. On striking the balance, payment was to be made by, or to, the Receiver or Southern as the case might be.
 
 
 7
 While the formal record is sketchy on the point, we get the impression that the trouble with this account started in 1958. The Receiver was apparently making a strenuous effort in the maintenance and repair of the Railway properties to overcome the deficiencies which made the Railroad simply unsafe to operate. Safety considerations ultimately led to the Court's insistence, and the Interstate Commerce Commission's concurrence, that the Railroad be abandoned. It is clear that the account first became in arrears in June 1958. By August 1958, it had increased to over $21,000; in November $37,000; by October, 1958, $105,000; and the maximum of $152,000 was reached in September 1960. Of course, Southern was aware of what was going on.
 
 
 8
 On September 30, 1960, Southern filed C.A. 871 seeking a judgment for the balance due and injunctive relief requiring the Receiver to segregate so much of the freight moneys collected from the consignees as represented the amounts "collected for or on behalf of or belonging to * * * Southern." On October 24, 1960, the Court entered a partial judgment in C.A. 871. The Court found that the Receiver had repeatedly advised Southern that he was unable to make the payments, but though this condition continued, no specific demand for segregation of funds was made until about May 1960. The Court also found that the Receiver had used "portions of funds collected as freight revenue * * * belonging to Southern * * * for the operation of the receivership properties." And in a conclusion of law the Court declared that "The amounts collected by the [Receiver] for the account of Southern * * * under what is known as the junction settlement arrangement constitute trust funds and * * * are collected [by the Receiver] as the property of * * * Southern * * * and are its property." Part of the relief granted was a requirement that such collections be segregated. This was done.[4]
 
 
 9
 But it should be pointed out that only Southern and the Receiver were parties to C.A. 871. The taxing authorities were not actual parties. Presumably because of this the Court, after granting summary judgment on March 2, 1961, for foreclosure of the mortgage, entered an additional supplemental decree in C.A. 871 on March 10, 1961. The Court fixed the sum with interest due by the Receiver, but in connection with the prayer of Southern that the Court "adjudge, decree and declare the rights and legal relations of the parties * * * and particularly that the Court declare that the monetary judgment herein rendered should be superior to the claims of the Receiver and his attorney," the Court declined to make such declaration. It expressly held that "The rank of the judgment in that respect, as well as its priority in the distribution of funds which are or may hereafter come into the hands of the Receiver for distribution under the orders of this Court, shall remain for future determination by the Court." It is that "future determination" subsequently made which is the dispute here. Whereas in C.A. 871, as between the Receiver and Southern, the Court held the collections to have been "trust funds" the special Master rejected "the contention that the judgment represents trust funds". He found — and with no contradiction — however, that these freight collections had been used by the Receiver "without express Court permission for operating expenses." Here the Master likened it to the Operating Expense claim which would, at most, mean that the collection and the unauthorized diversion of such freight monies "might constitute an unauthorized, albeit involuntary loan by the Receiver."
 
 
 10
 While Southern, by its exceptions to the Master's report and in the argument of them before the District Judge, did insist that if tracing were the determinant, it should be given a chance to offer testimony, the record does not reflect what it would have been. We can credit fully, as did the Master, the proposition that the Receiver wrongfully diverted the funds for operating expenses. We can assume, as the findings imply, that much of this money then went into repairs, replacements, and maintenance of worn out and dilapidated facilities and equipment as this enterprise was undergoing its death struggle on the eve of the coroner's verdict from the ICC. Ionion Steamship Co. of Athens v. United Distillers of America, Inc., 5 Cir., 1956, 236 F.2d 78, 1956 AMC 1750. But considering the very small amount received for all of the Railroad properties sold as they were in two units, it would be an affectation to send this hoary case back to commence its 37th year on a quest as artificial as that.
 
 
 11
 But Southern makes a contention worthy of serious consideration that independent of tracing, these were trust funds for which a priority ahead of the tax claim should have been accorded. This is based on a line of cases which hold as much where certain funds have been wrongfully applied by the Court appointee during the pendency of a receivership, bankruptcy, or reorganization operation.[5] But each of these cases substantially involves monies belonging to, and collected for, various governmental agencies in the form of withholding taxes, sales or excise taxes, payroll taxes, and the like. Where a statute makes a business or its court-appointed successor a collector of public funds, we think there is a strong policy at work to give them an effective priority. Any other principle not only jeopardized the process of tax collection, but it means that through the unauthorized use of public funds, some creditors (those who were paid by such funds or their equivalent) have received a substantial actual preference.
 
 
 12
 But apart from quasi public collections, from a practical point of view, we do not see where using money which rightfully belonged to Southern is of any substantial difference from using a railroad car, or a jointly operated railroad track, or a jointly maintained railroad depot which belonged to Southern, but for which rent and other charges were never paid by the Receiver. Actually, it was not as bad as Southern makes it out. The Receiver had a right to collect and to retain. The duty to remit was limited to the balance when and as struck in the periodic settlements. Only then did funds, rightfully collected and mingled, acquire a "trust" character.
 
 
 13
 It is true, of course, that Southern protested the unauthorized diversion of these funds. And the Court expressly found that it did not acquiesce in these practices. But this went on with no effective action taken and all the while no one better than Southern knew the precarious condition — fiscal and physical — of this ailing Railroad. Nevertheless, Southern continued to disburse its own funds to its prior connecting carriers with a full awareness that the funds were not being reimbursed by the Receiver, and that, as with the routine day-to-day operating charges, the Receiver was using its money, its supplies, and its facilities on which to run the Railroad.
 
 
 14
 The consequence is that we affirm the District Court's holding that this was not a claim entitled to preference.
 
 
 Operating Expense Claim
 
 
 15
 At the same time, we are of the clear view that the Traffic Balance claim just discussed has a standing at least as good as, and equal to, the Operating Expense claim. That claim cannot really be questioned as an expense of carrying on the receivership. But in a very real, and actually an even more direct, sense the continued substantial direct contribution of much needed cash represented by the Traffic Balance claim was what enabled the Railroad to keep on running. It shares, therefore, with the others as Operating Expenses.
 
 
 The Supremacy of the Mortgage
 
 
 16
 Southern tries to circumvent the problem of preference and priority by the bold assertion that the mortgage has a supremacy over the competing tax claims. Of course, when it does so, its status is that of a bondholder, not a commercial creditor. In doing so, it likewise champions the cause of the Trustee (and its New York counsel) for the small fees which the District Court disallowed.
 
 
 17
 Southern's agitation over this simply misses the mark. But by this contention it serves to emphasize why the tax claims are not asserted in the usual terms of a lien having an absolute statutory priority. Thus, the Federal Government candidly acknowledges that it does not in any way rely on 31 U.S.C.A. § 191 which, enacted originally in 1797, has come to be known as § 3466. This is no gratuitous concession. It is a forthright recognition of at least this fact of life that this statutory priority gives way to a valid recorded first mortgage. This is so no matter how sweeping and emphatic the terminology of § 3466 is. Brent v. The Bank of Washington, 1836, 10 Pet. 596, 611, 35 U.S. 596, 611, 9 L.Ed. 547; Savings & Loan Society v. Multnomah County, 1898, 169 U.S. 421, 428, 18 S.Ct. 392, 42 L.Ed. 803; United States v. Bond, 4 Cir., 1960, 279 F.2d 837, 841, cert. den. 364 U.S. 895, 81 S.Ct. 220, 5 L.Ed.2d 189; Exchange Bank & Trust Co. v. Tubbs Mfg. Co., 5 Cir., 1957, 246 F.2d 141; United States v. Atlantic Municipal Corp., 5 Cir., 1954, 212 F.2d 709, 711.
 
 
 18
 The Government is not contending that its tax claims are superior to the mortgage debt as such. What the Government asserts, and properly so, is that something has intervened which compels some practical adjustment. The intervening event is the equity receivership in which the properties are operated for the benefit of all creditors including the superior mortgage bondholders. A means must be found, then, to pay the cost of such operations. Consequently, bondholders and mortgagees of a debtor in receivership must stand aside in a distribution of assets until the expenses of the administration of the receivership are satisfied. Fosdick v. Schall, 1879, 99 U.S. 235, 25 L.Ed. 339; Burnham v. Bowen, 1884, 111 U.S. 776, 4 S.Ct. 675, 28 L.Ed. 596; Michigan by Haggerty, v. Michigan Trust Co., 1932, 286 U.S. 334, 52 S.Ct. 512, 76 L.Ed. 1136; Union Trust Co. of New York v. Illinois Midland R. Co., 1886, 117 U.S. 434, 6 S.Ct. 809, 29 L.Ed. 963; Kennebec Box Co. v. O. S. Richards Corp., 2 Cir., 1925, 5 F. 2d 951.
 
 
 19
 And, of course, following this reasoning a practical view requires that, quite apart from the question of relative priority, taxes be regarded as an essential element of the cost of the operation of the business administered under a receivership. The statute fixes it, 28 U.S. C.A. § 960, as do Court decisions. Michigan, by Haggerty, v. Michigan Trust Co., supra; Reconstruction Finance Corp. v. Missouri-Kansas-Texas R. Co., 8 Cir., 1941, 122 F.2d 326; Liberty Mutual Ins. Co. v. Johnson Shipyards Corp., 2 Cir., 1925, 6 F.2d 752. Taxes as an unavoidable expense of operation are readily appreciated in the form of ad valorem taxes on the ownership of property. Thus Judge Learned Hand expressed it: "The taxes, which were a condition upon their continued occupation, were as much a part of their expenses as heat, custody or current upkeep * * *. The receivers having once chosen to accept the property, the taxes were an expense of operation, regardless of the outcome." MacGregor v. Johnson-Cowdin-Emmerich, Inc., 2 Cir., 1930, 39 F.2d 574, 576. And this was elaborated upon by Judge Sanborn, "This is not because such taxes are debts of the insolvent or the trust estate or because the receivers have assumed the obligations of the mortgagor to pay taxes upon the mortgaged premises, but because the receivers are operating the property, and current taxes are to be regarded as ordinary expenses of operation." Hennepin County v. M. W. Savage Factories, 8 Cir., 1936, 83 F. 2d 453, 455.
 
 
 20
 The result is, therefore, that the supremacy of the mortgage debt, unquestioned as it is, is of no significant relevance in the distribution of funds in payment of costs of administration of the receivership estate.
 
 
 Priority or Equality of Tax Claims
 
 
 21
 Of course, the theory allowing recovery of taxes as a cost of operations is important in determining relative priority of ranking. As we have seen, no statutes give priority, and those which purport to are held to give way to a superior mortgage lien. The cases allow tax claims because they bear an essential relation to the continued operation of the business. This is to introduce equitable and practical considerations, rather than mandatory absolutes. Thus, as we once phrased it, here the door for participation by the Government in the fruits is "opened only by the touch of the wand of equity and not by the sheer weight or the loud peremptory knock of the sovereign's scepter." United States v. Maryland Casualty Co., 5 Cir., 1956, 235 F.2d 50, 53, 1956 AMC 1822, 1826.
 
 
 22
 When the theory of an operating expense is the sole basis for the allowance of the tax claims, we think it is a distortion to ascribe to them a priority over all other operational claims. Operational expenses they surely are, but they are scarcely more operational than other traditional charges, such as repair and maintenance of railway equipment, rental and apportionment of operating charges for jointly maintained tracks and depots, rental or railway cars, or the like. In reaching contrary conclusions, it is often said that priority should be accorded tax claims because without taxes there would be no Government and without Government there would be no business. But this for-want-of-a-nail-argument should not close our eyes to reality. We know that the Governments of each of the cities and counties, that of the States of Georgia and North Carolina and of the United States did, and would have continued to, exist regardless of the fate of the Tallulah Falls Railway Company. So it is actually more realistic to say that without the continued operations by the receivership, there would have been no payrolls to generate the taxes or the contributions to the Railroad Retirement Fund which are here involved.[6]
 
 
 23
 This is no mere theorizing in determining what ought to be done in this particular record, for it is uncontradicted that this is the way the taxing authorities treated this matter until the enterprise collapsed, and it was time for the lawyers to enter as gleaners.
 
 
 24
 In 1939 and again in 1942 the Receiver was faced with, and faced up to, a critical problem. As a person, a citizen and a Court officer he was conscious of his duty to remit currently all State and Federal payroll taxes and similar payroll contributions. But, he reported formally to the Court, he could not continue to run the Railroad if these taxes were currently paid. The Court instructed the Receiver to work something out. And this he most assuredly did. For by formal agreements of August 1, 1939, and renewed again in June 1942, and approved in each instance by the District Court in the equity receivership case, the United States Collector of Internal Revenue and the Georgia Bureau of Unemployment Compensation made binding agreements concerning the current payment of taxes. The agreement recited that the Receiver had advised the District Court that payment of such taxes "had not been made and could not be made without seriously crippling or preventing the further operation of the Railroad." It was first agreed[7] that these payroll taxes should be classified as operating expenses of the Railroad. Next, operating expenses were divided into class (1) and (2), with the taxes in (2). All expenses in (1) were to be first paid before operating revenues were to be used for taxes (2). Of course paragraph (e) excluded "application to the corpus of the receivership estate." But, as we have pointed out above, these tax claims do not, and cannot, go to the corpus of the estate itself. The corpus of the estate was subject to a first preferred mortgage. And, in any case, the proceeds of the sale of the property do not technically qualify as "current operating revenue" out of the surplus of which the taxes were to be paid.
 
 
 25
 We have mentioned this not because we regard it as binding as a legal proposition, for in that case it might itself give the Operating Expense creditor (Southern) a priority without regard to the trust theory or otherwise. We mention it to show the reasonableness — hence the equity — of considering one not more, but not less, important than the other as a real operation expense. Consequently, whatever might be proper under conditions and circumstances other than those presented in this prolonged litigation, we think that without indicating approval or disapproval of contrary expressions applicable to different situations,[8] this is the case in which all of these expenses should be thrown together so that each will participate in the net fund for distribution in the proportion that each of the claims bears to the total of all claims.[9] See 3 Collier, Bankruptcy (14th Ed.) § 62.14 at 1533.[10]
 
 
 Trustee and Its New York Counsel's Fees
 
 
 26
 The District Court disallowed the fee of $500 to the Trustee under the mortgage indenture and fees of $3,014.96 to its New York counsel. Here again the claim rests on the supremacy of the mortgage and a liberal application of its own terms. For reasons outlined above, we are not dealing with that here. Consequently, the question is whether these two fee claimants have contributed to the sum out of which administrative expenses of the receivership are to be paid. On this record the Government is right in its contention that the initiation of a general receivership gives the moving party no lien or charge against the property in the hands of the receiver, and such party has no priority in distribution.[11] So far as this record reveals, the bondholders were protecting their own interests only, and their activities made no contribution to the whole. We therefore affirm the disallowance.
 
 
 Fee of Charles Bloch
 
 
 27
 The District Court allowed a fee to Charles Bloch, Esq. who appeared here and below as leading counsel for Southern, as bondholder, Southern as creditor, and the trustee. No question was raised below, or is now raised here, as to the amount of the fee or the finding that in fact he rendered services of value to the whole fund. With the fee of the trustee (and its New York counsel) disallowed, logic might suggest that the same disposition should follow here. But this is again to forget that equity, by its nature, is to take regard of factors which distinguish things which appear to be, but really are not, alike. A couple of specific things from this record will illustrate why the trial Court was justified in finding that this counsel, as a sort of landbased General Average, made contributions of value to the fund out of which the claims are now to be paid.
 
 
 28
 First, he was one of the active counsel who helped the District Court construct the plan of sale by which properties were divided into two units. This divided properties on a practical basis which undoubtedly made their purchase more attractive and hence at a higher price.
 
 
 29
 Next, a very critical stage was reached on the hearing to confirm the sale. The successful bidder, a community promotion enterprise, was doubtful of its ability to comply pending final determination of priorities of claims. Hence additional time was essential. None of the parties opposed allowing additional time. But it was thought by nearly all to be essential to have the sale confirmed with time extended 30 days to permit compliance. This was necessary to avoid the likelihood of a long and costly delay in point of time, advertising expense, and the like if confirmation of the sale itself was postponed only to have the sale take place a second time. Following this course, a 30-day extension for compliance was informally accepted, but then a real stumbling block arose. The Receiver advised the Court that insurance on the properties had been cancelled by the insurers effective as of the date of the hearing. The insurers had, the Receiver advised, positively declined to extend the insurance any further. The Court expressed an unwillingness to have the properties exposed without insurance. At this practical impasse, a recess was suggested by this counsel, and through the facilities available to him in connection with his representation of these other interests, the insurers were prevailed upon by Southern to extend the insurance.
 
 
 30
 We do not mean that this itself was worth the amount of the fee allowed. It does, however, illustrate that this counsel was, and has been, rendering services of immediate value. All were apprehensive here of one of two things. First, the sale would not be consummated which would present the likelihood that on a second sale the price obtained would not be so favorable. And second, in any event, the parties were all in agreement that the mechanical details of arranging for a second sale would prolong this old case another three to six months during all of which time there would be further pressing problems growing out of the necessity of the Receiver taking some care of the properties and the like.
 
 
 31
 The trial Judge knew, as we certainly do as well, that this disposition of this run-down dilapidated property having no going-concern value as an operating unit, just did not happen. It took the concerted cooperative efforts of the Court, the special Commissioner appointed, and all counsel including this counsel. It was for the trial Judge to assay the value of the services and the extent to which they contributed toward bringing about a fund out of which the objecting creditor — the United States Government — now gets substantial payment of tax claims which, with its approval, had long been held in abeyance. We therefore affirm the allowance of this fee.
 
 
 State Tax Claims
 
 
 32
 Southern attacks the allowance of the tax claims of the Georgia and North Carolina entities on the grounds that they are inferior to the first mortgage lien, and in any case the Georgia claims are barred for any years prior to 1954. For the reasons previously outlined, the tax claims of these State entities are allowed, not because they are superior to the mortgage lien, but because they represent actual practical cost of operation during receivership. The limitation defense rests on certain cited Georgia Code provisions for failure of the various taxing authorities to issue executions. Consequently, it is urged, these entities lost whatever liens for taxes they may have had. It is conceded, of course, that by virtue of the Federal equity receivership, any such executions could not have been satisfied. The failure to take this "paper" step having no practical value or significance, affords no obstacle. In satisfaction of claims for taxes which arose and were payable during the Receiver's operations, but the collection of which was stayed and forbidden by the receivership injunction, a court of equity on equitable grounds may certainly allow a pro rata participation in the small fruits remaining.
 
 
 The Epitaph
 
 
 33
 It therefore follows that the decree is reversed and modified in part, and affirmed in part. As there may be mechanical problems in adjusting specific claims, or the like, the case is remanded to the District Court to permit it to enter such orders as may be required which are consistent with this opinion. This will also, we hope, permit the District Court which has nurtured this case for so long to memorialize the end of Equity No. 5 and with it Tallulah Falls Railway Company.
 
 
 34
 Reversed and modified in part, and as modified affirmed.
 
 
 35
 Affirmed in part.
 
 
 36
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 In 1933 the Interstate Commerce Commission authorized the abandonment of the entire line of Tallulah Falls Railway Company, but the Court did not order the abandonment. But finally in August 1959 under direction of the District Court, the Receiver applied to the Interstate Commerce Commission for permission to abandon and this was granted November 17, 1960
 
 
 [2]
 The judgment in Civil Action No. 871 totaled $147,095.53. But the Court in fixing priorities in the receivership distribution allowed Southern full credit for certain funds approximating $8,000 in the receiver's hands which the decree in C.A. 871 had required him to keep separate
 
 
 [3]
 Judgment was entered pursuant to stipulation between the Receiver and Southern. This represented, as detailed, amounts owed by the Receiver for his proper proportion of freight car repairs, tests and inspection of track scale at Cornelia, Georgia, taxes, and charges on operation of joint facilities, stations, rental of station and tracks, material furnished by Southern, hire and per diem of freight cars, repairs on railway equipment, and the like
 
 
 [4]
 See note 2, supra
 
 
 [5]
 City of New York v. Rassner, 2 Cir., 1942, 127 F.2d 703 (New York City Sales Tax statute making vendor a "trustee"); In re Airline-Arista Printing Corp., 2 Cir., 1959, 267 F.2d 333, affirming per curiam S.D.N.Y., 1957, 156 F.Supp. 403 (Federal income and social security taxes withheld from wages paid to employees); Hercules Service Parts Corp. v. United States, 6 Cir., 1953, 202 F.2d 938 (Federal income and social security taxes withheld from wages paid to employees); Shipe v. Consumers Service Co., N.D. Ind., 1928, 28 F.2d 53 (state gasoline sales tax); cf. In re Allied Electric Products, Inc., D.N.J., 1961, 194 F.Supp. 26 (withholding taxes deducted from wages paid employees)
 
 
 [6]
 By stipulation and order the tax claim of the United States was:
 Social Security Act 1936-1939 $ 4,707.80
 Railroad Unemployment
 Insurance Act 1939-1961 48,756.01
 Railroad Retirement Act 1937-1961 146,927.63
 ___________
 $200,391.44
 None of these involves taxes or tax contributions withheld from employees. All such withholdings were promptly remitted by the Receiver.
 
 
 [7]
 "* * * it is/agreed by the Receiver * * * and the * * * Collector of Internal Revenue * * * as follows:
 "(a) the taxes * * * accrued and yet to accrue under * * * of the Social Security Act and the * * * Carriers Taxing Act shall be classified as operating expenses of the Railroad.
 "(b) All operating expenses shall be divided into two divisions, viz.:
 "(1) The current operating expenses that are essential and necessary to the operation of the railroad, such as maintenance of way and equipment, coal and other supplies, salaries, wages, and other miscellaneous and general operating expenses;
 "(2) The taxes herein mentioned.
 "(c) The current operating revenue from the Railroad shall be applied first to the current operating expenses [(b) (1)] * * *
 "(d) After the * * * operating [expenses] as defined * * * have been paid, the balance if any of the current operating revenue shall be applied to the taxes [(b) (2)] * * *.
 "(e) This agreement applies only to current operating revenue and shall not be considered as having any application to the corpus of the receivership estate. * * *"
 
 
 [8]
 The Government particularly stresses: Piedmont Corp. v. Gainesville & N. W. R. Co., N.D.Ga., 1929, 30 F.2d 525; Wire Wheel Corp. of America v. Fayette Bank & Trust Co., 7 Cir., 1928, 30 F.2d 318; Coy v. Title Guaranty & Trust Co., 9 Cir., 1915, 220 F. 90; Reconstruction Finance Corp. v. Missouri-Kansas-Texas R. Co., 8 Cir., 1941, 122 F.2d 326; Liberty Mutual Ins. Co. v. Johnson Shipyards Corp., 2 Cir., 1925, 6 F.2d 752
 
 
 [9]
 Total claims allowed:
 United States Government $200,391.44
 Georgia and North Carolina
 Political Entities 110,707.86
 Southern's claims:
 Traffic Balance Net 139,657.52
 Operating Expenses 106,016.65
 ___________
 Total $556,773.47
 These participate pro rata in the balance for distribution of $262,526.48.
 
 
 [10]
 "On the other hand, even taxes accruing during the course of administration should not and may not fare any better than other expenses of administration, since all such items are within the first priority, so that where there are not sufficient funds to pay expenses of administration in full, the trustee acts negligently and at his own risk if he gives such taxes precedence over other administrative expenses. * * *"
 
 
 [11]
 The Government cites George v. St. Louis Cable & W. Ry. Co., E.D.Mo., 1890, 44 F. 117; Bergin v. Robbins, 1929, 109 Conn. 329, 146 A. 724; Winakur v. Leibowitz, 1937, 173 Md. 252, 195 A. 592